# CHICAGO, R. I. & P. RY. CO. v. McKONE.

No. 2315.   Opinion Filed October 23, 1912.

(127 Pac. 488.)

1. **WATERS AND WATER COURSES—Injuries by Flowage—"Extraordinary Flood."** An extraordinary flood is one of those unexpected visitations whose coming is not foreseen by the natural course of nature, and whose magnitude and destructiveness could not have been anticipated, and prevented by the exercise of ordinary foresight.

2. **SAME—"Ordinary Flood."** An ordinary flood is one, the repetition of which, though at uncertain intervals, might by the exercise of ordinary diligence in investigating the character and habits of the stream have been anticipated.

3. **NEGLIGENCE—Elements—Act of God.** A defendant is not liable for damage resulting solely from an act of God; but if the defendant's negligence is a present contributing proximate cause, which, commingled with the act of God, produces the injury, then defendant is liable notwithstanding the act of God.

4. **WATERS AND WATER COURSES — Injuries from Flowage — Question for Jury.** In a suit for damage from a flood, where the defense is that the flood was so unusual and unprecedented as to amount, in law, to an act of God, thus relieving the defendant of all liability, the question should be submitted to the jury under proper instructions from the court, where the evidence is such that in weighing it the minds of reasonable men might fairly differ on the question as to whether the flood was so unusual and unprecedented that its extent and resulting effects could not have been reasonably anticipated and provided against by an ordinarily careful person in defendant's situation.

5. **ESTOPPEL—Negligence.** In a suit for flood damage resulting from a negligent construction or maintenance of a bridge and embankment across a stream and the adjacent low lands, the fact that plaintiff as a subcontractor put in place part of the dirt embankment does not operate as an estoppel against him in a suit based upon negligent construction and maintenance, where it is not shown that he possessed any knowledge, experience, or skill in engineering, or as to the suitableness or sufficiency of such construction, but merely worked under the direction and specifications of defendant's engineers.

(Syllabus by Brewer, C.)

*Error from District Court, Kingfisher County;*
*A. H. Huston, Judge.*

Action by Roger McKone against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*C. O. Blake, H. B. Low,* and *F. L. Boynton,* for plaintiff in error.

*D. K. Cunningham* and *L. R. Weiss,* for defendant in error.

Opinion by BREWER, C. · This is a suit for flood damage. In 1900 a line of railway was built from Kingfisher to Cashion, and has since been maintained and operated by the Chicago, Rock Island & Pacific Railway Company as a branch line, connecting with its main line running through Kingfisher. This branch line runs from Kingfisher easterly, and near the limits of the town crosses "Uncle John's creek," and runs along the south end of plaintiff's 80-acre farm; the main body of the land lying east of the creek, but extending across it to the west side at the point the railway crosses. The plaintiff deeded a right of way across his land when the road was built, and as a subcontractor put in part of the· "dump" or fill on the west side of the creek. The roadbed out of town is a slight fill to the first bank or bench of the creek valley. From this first bank the land benches down to the water bed of the creek, a distance of about 300 feet, making a fill from the first bank down to the water bed bank of an average of thirteen feet. This creek is bridged; the bridge being about 26 feet high in the center of the stream. The fill of earth extends down into the creek bed at the bottom, and slopes upward, leaving an opening of 210 feet at the rails and about 140 feet at the creek bed. On the east side the creek bank is lower than the track level on the west side, so that at the east end of the bridge there is a slight fill of about fourteen inches. The land is higher right at the creek on the east side than between that point and the east bench of the creek valley which marks the beginning of the uplands, so that the railroad, commencing with a slight fill at the east end of the bridge, gradually increases the fill as it proceeds east to an average of four or five feet, in places as much as eight feet, until it strikes the upland. This fill extends along the south line of plaintiff's land,

and prior to the flood had no opening or culvert between the east end of the bridge and the uplands, a distance of about a half mile. The creek flows north. The land between the immediate creek bank and the upland is lower than at the creek bank. After making this solid fill from the bridge east, a cut or burrow pit was made along the south side of the track from the bridge east, about four feet deep and twelve feet wide so as to drain this low land into the creek at the bridge. South of the bridge the creek runs northeasterly. At the bridge it runs nearly north, and then almost immediately bends slightly to the northwest. During the flood the creek's main channel was full of water overflowing the banks of the bed of the stream at places. The water, when the banks had become full, struck the heavy fill of earth at the west end of the bridge, and the obstruction deflected the water into a current across the stream to the east bank, where it found an outlet in the burrow pit or drainage ditch extending east from the bridge across the low lands to the hill. This water quickly filled the low valley depression south of the railroad dump, making of this low land almost an inland sea. These waters so deflected, in connection, perhaps, with some overflow from further up the creek, accumulated into so large and heavy a volume that they finally overflowed the dump and washed it cut for 1,000 feet. When it gave way, this enormous body of impounded water, which is shown to have been nearly eighteen inches higher south of the railroad than on the other side, together with telegraph poles, trees, brush, cross-ties, and other debris, swept across plaintiff's farm, washing the soil away as deep down as it had been plowed in places, destroying and carrying with it portions of 60 acres of ungathered cotton. The suit is based on the negligent construction and maintenance of the roadbed and bridge, especially in that the heavy fill on the west side obstructed the natural flow of flood waters, and caused such waters to debauch across to the east side, where the burrow pit led them into the low lands south of the dump and of plaintiff's land, where for want of a culvert, or opening in the dump, they were impounded in such volume that, when they overflowed

and washed out the dump, such a swift and heavy current was put in motion as to cause the damage complained of.

All the errors urged here are based on the assignment that the court should have granted a new trial, and the argument proceeds on the theory that the court should have directed a verdict for defendant. This contention is urged for the following reasons: (1) That the flood was an act of God. (2) That plaintiff, having conveyed the right of way across his land, and having constructed a portion of the dump as a subcontractor, was a joint tort-feasor in case the construction was negligent, and would therefore be estopped.

These questions were raised in a demurrer to plaintiff's evidence, and later by a request that the jruy be instructed to find for defendant for the reason thus stated.

1. We are asked to reverse this case because the court refused to instruct the jury that the flood responsible for the damage was an act of God, for which defendant could not be held in any way responsible. This we have no right to do, under the evidence in the case, for two reasons at least. The evidence as to the extent of the rainfall and of the flood, as compared with other preceding rainfalls and floods, is not in entire harmony. While it may be true that the evidence all showed that the water in the creek was some higher than in any of the known former floods, yet it is shown that, while the main banks of the creek were overflowed in this flood at several places, it is also shown that they were overflown in previous floods. More than one witness testified he had seen what he believed to have been heavier rainfalls in this vicinity. Whether the rainfall on this occasion, and the resulting flood, was so unusual and unprecedented as to amount to a *vis major*, was, under the evidence, a proper question to be submitted to the judgment of the jury. The lower court took this view of the evidence, and submitted it to the jury defining when a flood would be an act of God as follows:

"An extraordinary flood is one of those unexpected visitations whose coming is not foreseen by the natural course of nature, and whose magnitude and destructiveness could not have

been anticipated, and prevented by the exercise of ordinary foresight."

This is the definition approved in *Town v. Hicks,* 23 Okla. 684, 102 Pac. 79, 24 L. R. A. (N. S.) 214. And an ordinary flood thus:

"An ordinary flood is one, the repetition of which, though at uncertain intervals, might by the exercise of ordinary diligence in investigating the character and habits of the stream have been anticipated."

The jury were then told, if the flood in question was an extraordinary one, that the defendant could not be held liable. In so stating the matter the court was rather more favorable to the defendant than it had the right to expect. In this, that while the railway would be exempt from liability, if the damage resulted solely from an act of God, yet, if its own negligence was a present occurring proximate cause, co-operating with the act of God in producing the injury, then the railway would be liable notwithstanding the act of God. This is made clear by a careful reading of *Armstrong, Byrd & Co. v. Ill. Cent. R. Co.,* 26 Okla. 352, 109 Pac. 216, 29 L. R. A. (N. S.) 671. And on the point the authorities are collected and discussed in *M., K. & T. Ry. Co. v. Johnson et al.,* 34 Okla. 582, 126 Pac. 567. See, also, *C., R. I. & P. Ry. Co. v. Logan Snow & Co.,* 23 Okla. 707, 105 Pac. 343, 29 L. R. A. (N. S.) 663. There was evidence in this case tending to show that, although the flood should be held to be an act of God, yet that but for the improper maintenance of its dump on the west side, and its borrow pit and dump on the east side of the bridge, without openings, in the light of its experience with another prior flood which washed out the west dump, the injury and damage might not have happened even with the flood that occurred. This is the second reason why the court did not err in refusing to instruct a verdict for defendant. And although the court did not cover this phase of the case, had it done so, it would have been against the interest of defendant, and, of course, it does not complain that it was not done.

2. This brings us to a consideration of the contention that because plaintiff deeded the right of way across his land and then as a subcontractor put in a portion of the dirt fill on the

west side of the creek, that he is estopped from now complaining of the improper and negligent construction of the roadway, and from recovering for damages occasioned thereby. The matter of his deeding the right of way is not discussed in the brief to any extent, and no authorities cited to sustain the point. On the other point, that plaintiff made a portion of the fill, defendant states its position in the brief as follows:

"It is an elementary principle laid down in the law of torts that no person can recover from another for the consequence of their joint wrongful act. There are many illustrations of this and many phases of the law arising out of different sets of facts. It is somewhat allied in its principles to the idea of contributory negligence, and contribution between joint tort-feasors."

The defendant then uses several illustrations. For instance, that, where a person is injured while performing with another a wrongful act, he can have no action against such other person; or where a person is a member of a mob, or is committing a trespass, he can have no action if he is injured while so doing; or where two persons commit a joint wrong against a third, and recovery of damages is had against one, he cannot in payment have a contribution from his copartner in the wrongful act; or, where plaintiff's cause of action grows out of his own wrong, the door of the court is closed to him—*ex dolo malo non oritur actio*. Authorities are cited along the line of the illustrations made. We do not care to review them. We have no controversy with the doctrine they announce. We do not take them to be in point here, as we shall presently show. It is not claimed, nor is it attempted to be shown that this plaintiff had the slightest knowledge, experience, education, or skill with regard to engineering problems, or that he is other than an unskilled layman who can till the soil and haul and dump dirt in making a fill for a roadbed. That the proper and sufficient construction of roadbeds and bridges across streams and their adjacent bottom lands presents a problem demanding for its solution a high order of education, experience, and skill in technical engineering needs no argument. It is a fact within the knowledge of all men. It is admitted here, when the defendant attempts to show a proper construction by the testimony of its highly trained and expert

engineers.  Indeed, this is probably the only way, when in doubt, the matter could be demonstrated without actual test.  To illustrate—to determine the necessary opening to leave under a bridge across a stream, one must be able to take levels, ascertain and compute the drainage area to be accommodated.  The volume of water a given rainfall, within a given period, on this drainage area is likely to produce and which will arrive at the same time for passage under the bridge.  This involves the topography of the adjacent lands; if flat, they drain slowly; if they incline steeply and present precipitous slopes, more rapidly, and more water will seek an outlet at the same time.  These matters can only be determined, approximately, by the highly trained engineer.  A college professor, without such training, would be as helpless with such problems as a child.  What did this plaintiff know about them, and whether the railway was leaving an adequate waterway, sufficient to accommodate the flow of ordinary floods, or damming it up so as to overflow and injure his farm?  There is no indication here that he knew anything about it.  Was he then a joint tort-feasor with the railway, when it is not shown that he had the slightest knowledge of what consequences would flow from carrying out the engineer's plans?  It was the railway's construction, it was its plant, its specifications; its mind through its engineer determined the matter.  The plaintiff hauling his scraper full of dirt and dumping it on the fill was, as far as the engineering problem was concerned, but a blind uncomprehending instrument, carrying out the will of the railway, whose duty it was to know.  He is not shown to have been in any wise responsible for the improper construction.

The case should therefore be affirmed.

By the Court:  It is so ordered.