# Richmond.

## Southern Railway Company v. E. P. Neal and Others.

### November 18, 1926.

1. Railroads—*Flooding Lands—Substituting Culvert for Bridge—Case at Bar.*—In the instant case it was the duty of a railroad company when it erected a double box culvert as a substitute for a sixty foot open space under an iron girder bridge, to use ordinary care to make the culverts large enough to carry off all the water which would flow down the creek during the time of ordinary freshets, and also during the time of such extraordinary and unusual floods as should have been anticipated would occasionally occur in the future, because they had occasionally occurred in the past.

2. Waters and Water Courses—*Riparian Rights—Obstructing Flow of Water—Flooding Lands—Interference with Drainage of Upper Land.*—As a general rule the upper riparian owner has, as against the lower riparian owner, the right to have the water course flow from his land according to nature, and a lower owner has no right to pen back or obstruct the flow of the water so as to flood the lands of the upper owners, or by raising the level of the water in the channel interfere with the drainage of the upper land, or to subtract from the water power of the upper owner.

3. Waters and Water Courses—*Bridges, Culverts, etc.—Obstructing Flow of Water.*—Where bridges, culverts, etc., are constructed across water courses by railroad companies, municipalities, or other corporations, or by individuals, due care must be taken not to obstruct the natural flow, including that at seasons of either low or usual high water, and the failure to do so will render the offender liable for injuries to landowners caused by the penning back of the waters and the overflow of their lands; but such structures need not be constructed in such a manner as to permit the unobstructed flow of the water course in times of unprecedented and extraordinary freshets.

4. Waters and Water Courses—*Bridges, Culverts, etc.—Obstruction Evidence of Improper Construction.*—Failure to make proper provision for the flow of water under a bridge or culvert has been held to impose liability although such bridge or culvert may be constructed according to approved principles of engineering; the fact

that it does materially obstruct the flow being held to be in itself evidence that it was not properly constructed, regardless of the principles on which it was built.

5. WATERS AND WATER COURSES—*Extraordinary Flood—Act of God—Questions of Law and Fact.*—Whether an extraordinary flood is an act of God, as that expression is used in the law, is a mixed question of law and fact. The defining and limitation of the term, its several characteristics, its possibilities as establishing and controlling exemption from liability, are questions of law for the court, but the existence or non-existence of the facts on which it is predicated is a question for the jury.

6. WATERS AND WATER COURSES—*Extraordinary Flood—Act of God—Questions of Law and Fact.*—The province of the court is to define in proper instructions what flood would be regarded by the law as an act of God, and leave it to the jury to determine whether the evidence is sufficient to establish that the flood in question was an ordinary flood or was an extraordinary flood so unusual and unprecedented in its nature as to amount in law to an act of God.

7. RAILROADS—*Culverts—Flooding Lands—Case at Bar.*—In the instant case, an action for flooding plaintiff's lands by erection by defendant railroad of a double culvert instead of an open bridge, defendant's engineer was asked how it was ascertained what should be the size and character of the culverts. He answered that these things were determined by another culvert lower down the creek that had been there since the railroad had been built; and admitted that no survey of the watershed was made. It clearly appeared from the evidence that the engineer did not follow his guide (the other culvert) and that the double culvert was insufficient.

*Held:* That the railroad was liable for the flooding of the plaintiff's lands caused by the insufficient culverts.

8. WATERS AND WATER COURSES—*Extraordinary Floods—Case at Bar.*—In an action by plaintiff against defendant railroad to recover for the flooding of plaintiffs' lands, it was claimed by defendant that the flooding in question was caused by an extraordinary flood, an act of God, and that defendant was not liable. It was shown by several witnesses that there had been previous floods in the section drained by the creek in question and its tributaries which were as great or greater than the flood which caused the damage to plaintiffs' lands.

*Held:* That the flood which caused the injury complained of was not an act of God for which defendant was not responsible.

9. FLOOD—*Act of God—Burden of Proof.*—Where the act of God is presented as a defense in an action to recover damages against one obstructing a natural water course for injuries sustained by reason of a flood or freshet, the burden of proof is on the defendant to establish that defense.

10. Railroads—*Flooding Lands—Act of God—Railroad's Negligence Contributing to·Injury—Case at Bar.*—If in the instant case, an action against a railroad for flooding plaintiffs' lands, the flood in question could be properly classed as an act of God, yet if, as the evidence shows, the defendant company's negligence in the construction of a culvert contributed to the flooding of plaintiffs' mill, the company is still liable in damages for the injury done his property.

11. Act of God—*Act of God the Sole Proximate Cause of Injury.*—To relieve one of liability because a flood is, in law, an act of God, it must appear that the act of God was the sole proximate cause of the injury.

12. Instructions—*Repetition.*—Where the instruction given covered the law of the case it is not error to refuse to give others.

13. Appeal and Error—*Conflicting Evidence.*—Where all questions of fact are properly submitted to the jury, their findings, where the evidence is in conflict, is conclusive on appeal.

Error to a judgment of the Circuit Court of Nelson county, in an action of trespass on the case.   Judgment for plaintiff.   Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Harrison, Long & Williams*, for the plaintiff in error.

*S. B. & Robert Whitehead* and *Homer Richey*, for the defendant in error.

West, J., delivered the opinion of the court.

This was an action by E. P. Neal against the Southern Railway Company to recover damages to his grist mill located on Cove creek, occasioned by the alleged negligence of the defendant company in building a twin concrete culvert and underpass under its tracks over Cove creek and the adjoining county road.   The jury returned a verdict for the plaintiff for $2,993.50.   The defendant complains of the judgment which was entered upon that verdict.

Cove creek is a small stream in Nelson county which combines with Bear and Hickory creeks at Faber station, and continues to flow southwardly on the east side of the Southern Railway to Neal's Mill. Here it makes a short turn to the right of over ninety degrees, broadens for a short distance, then contracts and passes westward through the twin culvert under the tracks of the company, about 250 feet from the mill. After passing through the culvert it broadens and curves to the left and flows in a southerly direction for about 1,000 yards and then curves again to the left and passes through a cut stone arch culvert under the tracks of the company. On either side of the location of the twin culvert is a very high hill and the railroad embankment between them, as now constructed, is nearly fifty feet high. When the road was constructed in 1859 the engineers erected a single span steel girder bridge at this point, supported by stone abutments sixty feet apart, thus leaving a space of sixty feet for the water to pass. For the lower passage of the water they put in an eighteen foot oval top cut stone culvert, which has always carried off the waters of Cove creek in a satisfactory manner.

When the company double tracked its line in 1915, the engineers in charge replaced the steel girder bridge with a concrete, twin culvert and underpass. On each side of the culvert solid fills were erected so as to force the water through the culverts. The culverts are twelve feet wide and twelve feet high and separated by a two foot concrete wall. The underpass for the public road is sixteen feet wide and sixteen feet high, the bed of the road being five feet above its former level where it enters the underpass and eight feet above at the down-stream end, the underpass being separated from one of the culverts by a three foot concrete wall. The

top of the underpass extends ten feet above the top of the culverts. The underpass and culverts are 131 feet long.

The two box (twin) culverts have a cross-sectional area of 345 square feet, exclusive of the underpass, and of 394 square feet with the underpass. The arch culvert has a cross-sectional area of 306 square feet.

The stream level at the lower culvert is seven feet ten inches below the level of the twin culvert passage, with a fall of 9.4 inches per hundred feet between the two passages, while the fall above the upper passage is 1.3 inches per hundred feet.

The court's refusal to set aside the verdict of the jury and its refusal to give certain instructions are assigned as error.

Plaintiff in error contends (1) that it was guilty of no negligence in constructing the culvert and underpass in place of the steel girder bridge, and that they were ample to carry off all floods which it was bound to provide against; (2) that the flood which caused the injury complained of was an act of God, "for the consequences of which it is not responsible;" and (3) that plaintiff has not proven the damages allowed by the jury.

[1] It was the duty of the company when it erected the double box culvert as a substitute for the sixty foot open space under the iron girder bridge to use ordinary care to make the culverts large enough to carry off all the water which would flow down Cove creek during the time of ordinary freshets, also during the time of such extraordinary and unusual floods as should have been anticipated would occasionally occur in the future because they had occasionally occured in the past.

[2, 3] In 30 Am. & Eng. Ency. L. (2d ed.), page 374, quoted with approval in *American L. Co. v. Hoffman*, 105 Va. 349, 54 S.E. 25, 6 L. R. A. (N. S.) 252, 8 Ann. Cas. 773,

the law is stated thus: "As a general rule the upper riparian owner has, as against the lower riparian owner, the right to have the water course flow from his land according to nature, and a lower owner has no right to pen back or obstruct the flow of the water so as to flood the lands of the upper owners, or by raising the level of the water in the channel interfere with the drainage of the upper land, or to subtract from the water power of the upper owner  *  *  *.  Where bridges, culverts, etc., are constructed across water courses by railroad companies, municipalities, or other corporations, or by individuals, due care must be taken not to obstruct the natural flow, including that at seasons of either low or usual high water, and the failure to do so will render the offender liable for injuries to landowners caused by the penning back of the waters and the overflow of their lands; but such structures need not be constructed in such a manner as to permit the unobstructed flow of the water course in times of unprecedented and extraordinary freshets."

[4] In 27 Ruling Case Law, 1105-1106, the law is stated thus: "Bridges, trestles or culverts which are constructed over a stream must be so built and maintained as to provide, not only for the flow of all water that can be carried in the channel, but if the probabilities are that the stream to be crossed will at times overflow its banks, there is as much occasion to provide an outlet for the surplus water as for that which is confined within the channel.  The question is not whether sufficient provision has been made for the escape of the water of ordinary floods, but whether there was provision for the escape of the water of such unusual or extraordinary floods as it should have been anticipated would occasionally occur in the future, because they had occasionally occurred after intervals, though of

irregular duration, in the past. If, after the original construction of an obstruction and prior to the flood in question, other floods of a theretofore unprecedented character occur, demonstrating the faulty construction of the inadequacy of the waterway left by the obstruction, a new standard of obligation is erected and the duty arises to meet the new conditions thus established. Failure to make proper provision for the flow of water under a bridge or culvert has been held to impose liability although such bridge or culvert may be constructed according to approved principles of engineering; the fact that it does materially obstruct the flow being held to be in itself evidence that it was not properly constructed, regardless of the principles on which it was built."

[5, 6] At page 1107 of the same book we find this: "Whether an extraordinary flood is an 'act of God,' as that expression is used in the law, is a mixed question of law and fact. The defining and limitation of the term, its several characteristics, its possibilities as establishing and controlling exemption from liability, are questions of law for the court, but the existence or non-existence of the facts on which it is predicated is a question for the jury. It has accordingly been held that the court cannot, in an action for damages alleged to have been caused by the negligence of one obstructing a natural water course wherein the defense is that the flood was so extraordinary and unprecedented as to be deemed the 'act of God,' determine the flood was unusual or unprecedented, since that is the determination of a fact depending on evidence to establish it. The province of the court is to define in proper instructions what would be regarded in such an instance by the law as an act of God, and leave it to the jury to determine whether the evidence is sufficient to estab-

lish that the flood in question was an ordinary flood or was an extraordinary flood so unusual and unprecedented in its nature as to amount in law to an act of God." Citing *Garrett* v. *Beers*, 97 Kan. 255, 155 Pac. 2, L. R. A. 1916F, 1289; *Soules* v. *Northern Pac. R. Co.*, 34 N. D. 7, 157 N. W. 823, L. R. A. 1917A, 501; *Chicago, etc., R. Co.* v. *McKone*, 36 Okla. 41, 127 Pac. 488, 42 L. R. A. (N. S.) 709; *Greenock Corp.* v. *Caledonia R. Co.* (1917), A. C. Eng. 556, Ann Cas. 1918A, 1103 and note; Note, 8 Ann. Cas. 778.

In *American L. Co.* v. *Hoffman*, 105 Va. pages 352, 353, 54 S. E. 28, Judge Cardwell, speaking for the court, said: "They might be liable for an injury caused by 'extraordinary flows of water,' produced by geographic or climatic conditions—that is 'extraordinary flows' produced by natural causes; but surely they could not be liable for an injury caused * * * by unprecedented and extraordinary freshets which no reasonably prudent person could have anticipated, nor experience foretold."

In 2 Shear & Red. on Neg., section 728, discussing the liability of one who interferes with the natural flow of a stream, the author says: "He is guilty of negligence if he fails to anticipate and provide security against the ordinary changes of temperature, floods, etc., to which the country is subject; but he is not liable for the consequences of natural events, which are of such rare occurrence that he *could not reasonably anticipate them.*" (Italics ours.)

Plaintiff in error contends that the company's engineer, in determining the size of the culvert necessary to carry off the waters of Cove creek in normal and flood stages, had three courses open to him: "He might determine the area of the water shed drained by the stream in question, and taking into consideration the topog

raphy of the water shed along with its area, he would determine in theory the probable amount of water that might be expected in the creek in flood and in normal flow. By applying to this data certain formulae in current use in his profession, he could then compute the size of this culvert, or the cross-sectional area of the opening to be left for the stream. His optional course would be to use as the basis of his computation a waterway or culvert over the same stream in the same locality which time and practical use had shown to be satisfactory under such conditions, and using this as a guide, he could design another of equal or greater carrying capacity.''

[7] H. E. Noell, witness for the defendant, who was the assistant engineer in charge of the field work when the doubletracking was done around Faber, when asked how it was ascertained what should be the size and character of the waterways to be put over Cove creek, replied: "We determined those things by the culvert that had been there possibly since the railroad was first built. At this particular point, there is a stone arch culvert below that point, and that was our chief guide." He admits they might have made a survey of the water shed of Cove creek, but does not claim to have done so.

It clearly appears from the evidence that the company's engineer did not follow his guide. The lower culvert was eighteen feet wide and ninety-nine feet long, with only one opening, while at the upper passage they erected small twin culverts, twenty-four feet wide, twelve feet high and 131 feet long, with a two foot concrete partition wall in the center which was certain to catch the brush and driftwood and retard the flow of the water and cause it to pen back so as to flood the lands of the upper owners. They failed to give due

consideration to the crookedness of the stream and the slight fall in the stream level just above the twin culverts.

C. L. DeMott, expert engineer, witness for the plaintiff, testified that the company's engineers should have made a study of the "geographical, topographical, climatological and meteorological conditions," and taken into consideration the "character of the watershed above the openings" and "the character of the stream," in computing the size of the culvert, which they failed to do. Witness Demott also testified that a culvert of the same height, without a partition wall, would have carried off twenty-two per cent more water than the twin culverts which are now there; and that on account of the curvature of the stream just above the upper culvert, the upper culvert, to carry the same amount of water, should have been twenty-five per cent larger than the lower one. DeMott further testified that the longer the culvert the greater the friction and the more the speed of the water is retarded as it passes through, and they should have taken this friction into consideration in determining the size of the culvert. The twin box culverts are 131 feet long, while the culvert at the lower passage is only ninety-nine feet long. The same witness testified that the partition wall increased the friction and caught the driftwood, brush, etc., and piled them up over seven feet high, and thereby caused the water to rise seven feet higher than it would otherwise have risen.

It appears from the evidence that the flood of May 10 and 11, 1924, backed up on the main floor of Neal's mill and caused the damages complained of to the mill property, machinery and stock in trade; that on the day after the water subsided "there was a great hummock of drift, brush, trash, telephone pole, etc., lodged

right across the center or partition wall between the twin culverts;" that this hummock was seven feet high and fourteen feet wide, above the water; that the mill had been partially flooded only on three occasions before Neal purchased it, and these were caused by the dam breaking; that Neal raised the mill floor four feet above its former level, but the water rose to a depth of nearly three feet on this floor on May 10, 1924; that at points above the mill this flood did not rise as high as previous floods, while at the twin culvert it rose higher than ever before, going seven inches above the top of the culvert.

[8] It is shown by several witnesses that there had been seven previous floods in the section drained by Cove creek and its tributaries which were as great or greater than the one in 1924.

Where the defendant asks to be acquitted of all liability, on the ground that the flood causing the injury was an "act of God," the burden is on him to prove it.

[9] In 27 R. C. L., page 1107, we find this: "Where the act of God is presented as a defense in an action to recover damages against one obstructing a natural water course for injuries sustained by reason of an extraordinary flood or freshet, the burden of proof is on the defendant to establish that defense." Citing *Soules* v. *Northern Pac. R. Co.,* 34 N. D. 7, 157 N. W. 823, L. R. A. 1917A, 501. Note, Ann. Cas. 1918A, 1121.

[10, 11] If the flood of 1924 could be properly classed as an act of God, yet if, as the evidence shows, the defendant company's negligence in the construction of the culvert contributed to the flooding of plaintiff's mill, the company is still liable in damages for the injury done his property. To relieve one of liability because a flood is, in law, an "act of God," it must appear that the act of God was the sole proximate cause of the injury.

In 40 Cyc. 575-6 the law is stated thus: "If reasonable care and foresight have been exercised in constructing a railroad, the railroad company cannot be held liable because its structures have contributed to causing the overflowing of riparian lands at a time of extraordinary and unprecedented floods; but if there was negligence in the construction of the bridge, embankment, or other work, which contributed to the injury, it is no defense that the flood was unexampled or overwhelming." Citing in footnote 61: *Vyse* v. *Chicago, etc., R. Co.*, 126 Ia. 90, 101 N. W. 736; *Jones* v. *Seaboard Air Line R. Co.*, 67 S. C. 181, 45 S. E. 188.

In 27 R. C. L. 1107 we find this: "While it is the general rule that where rains are so unprecedented, and the flood caused thereby so extraordinary that they are in legal contemplation the act of God, one obstructing a natural watercourse will not be held liable; it must appear, in order to give immunity under the rule, that the act of God is not only the proximate cause but the sole cause of the injury." Citing *Chicago, etc., R. Co.* v. *McKone*, 36 Okla. 41, 127 Pac. 488, 42 L. R. A. (N. S.) 709; *Eagan* v. *Central Vermont R. Co.*, 81 Vt. 141, 69 Atl. 732, 130 Am. St. Rep. 1031, 16 L. R. A. (N. S.) 928. Note, Ann. Cas. 1918A, 1116.

Upon the question of damages, it is only necessary to say that there is ample evidence to warrant the jury in fixing the plaintiff's damages at the amount named in their verdict.

[12] The instructions given covered the law of the case and it was not error to refuse to give others.

[13] All questions of fact were properly submitted to the jury and their finding, where the evidence is in conflict, is conclusive here.

We find no error for which the judgment should be reversed.

*Affirmed.*