[No. 26260. *En Banc.* March 23, 1937.]

A. TOPE *et al., Appellants,* v. KING COUNTY, *Respondent.*[1]

[1]Reported in 65 P. (2d) 1283.

*Hare, Turner & Maurier,* for appellants.

*Warren G. Magnuson* and *Charles C. Ralls,* for respondent.

STEINERT, C. J.—Appellants, as plaintiffs, brought this action to recover damages to real property caused by the invasion of surface waters, and to obtain an injunction against the future diversion of such waters to the injury of their property. Trial before the court without a jury resulted in a judgment dismissing the action, following which this appeal was taken.

Appellants, husband and wife, are contract purchasers of a tract of land in King county, described as the south 300 feet of the north 602.64 feet of government lot 1, section 32, township 22 N., range 4 E. W. M., located about twenty miles south of Seattle and one mile from Redondo beach. The land has a frontage of three hundred feet on Puget Sound and extends back eastwardly about twelve hundred feet to a county road, described and known as the W. A. Hall road, which runs in a northeasterly and southwesterly direction.

For a short distance west of the Hall road, appellants' land has a gentle slope toward Puget Sound, then breaks somewhat steeply, forming a hillside which ends about midway in the length of appellants' land; at the foot of the hill, the ground levels off onto a bench which extends westwardly to a low bluff overlooking the beach.

Along the northerly portion of appellants' land, and running parallel with, and about thirty feet from, their north line, there was, prior to the circumstances hereinafter related, the vestige of an old abandoned skidway, or logging road, which formed a depression of two or three feet in the ground, and in the bed of which ran a small stream fed by springs in the rear of the property and emptying through a small trough onto the beach bordering the Sound.

Upon appellants' property are three ditches. One comes from the adjacent land on the north and formerly connected with the little stream flowing along the bed of the old skidway. The second runs south of the stream but does not connect with it; its waters, which are small in amount, are diffused upon the ground in the immediate vicinity. The third ditch diverts the surface waters from the hill in the rear and conducts them southwestwardly, away from the direction of the little stream, to the Sound.

Appellants' land is improved with a two-story frame house and a garage, located on the level area and near the bluff; it also has upon it a natural grove of alder, maple, and fir trees. Appellants occupy the premises during the summer and on week ends, and, during their occupancy since 1924, have cleared out some of the stumps, done some landscaping, and put in plants and shrubs.

On the land lying to the north of, and opposite, the middle portion of appellants' property, is a large

swamp or basin, about one hundred fifty feet wide from east to west and approximately seven hundred feet long from north to south, the southerly end of which is approximately one hundred or one hundred fifty feet from appellants' north line, and the northerly end of which lies in section 29, which is immediately north of section 32. This basin, which is bounded on the east and west by ranges of hills, has no natural inlet or outlet. At its southern extremity, there is an artificial ditch or channel which extends to, and connects with, the depression made by the skidway on appellants' land.

East of the Hall road and comprising from forty to one hundred acres lying in the northeast quarter of section 32, is an area of unimproved land, referred to in the record as the Betts area. Along the east line of section 32, which is also the eastern boundary of the Betts area, runs the Seattle-Tacoma Highline road. Along the north line of section 32, which is also the northern boundary of the Betts area, runs another county road, known as the W. J. Betts road, which extends from the Seattle-Tacoma Highline road on the east to the Hall road on the west.

The greater part of the Betts area is flat and swampy and contains many earth pockets. This area drains to the north in the direction of the Betts road. Within the Betts area and approximately one hundred fifty feet east of the Hall road, is a natural ridge of ground running north and south the full width of appellants' land and extending north of, and beyond, the Betts road. This ridge, acting as a barrier, has the effect of turning the drainage of the Betts area away from appellants' land. Beyond, or north of, the Betts road, the land slopes to the north and west, so that the natural drainage of the area on both sides of the Betts road is ultimately in those directions toward Puget

Sound and beyond the north end of the basin or swamp, previously mentioned, and considerably north of appellants' property. The outlet of the waters from this area into Puget Sound is through Woodmont Beach canyon, which, also, lies considerably north of appellants' land.

The Betts road was built in 1930, and, at the time of its construction, the county put a ditch along its south side up to about the point where the natural ridge crosses the road, and also installed an eight-inch culvert about half way between the Hall road and the Seattle-Tacoma Highline road for the purpose of allowing the surface waters from the Betts area to drain to the north in their natural way. To connect with the Hall road, the Betts road cuts through the natural ridge which runs parallel to appellants' property.

Some time after the Betts road had been constructed, and prior to 1933, the county extended the ditch running along its south side to the western terminus of the road and placed an eight-inch culvert underneath the Hall road at its junction with the Betts road, which point is about two hundred ninety feet north of the north line of appellants' property. Through this culvert, a small amount of water was able to flow westwardly from the Betts area underneath and across the Hall road and, after diffusing itself over the ground, become absorbed within a short distance from the outlet of the culvert. Prior to January, 1935, however, practically all of the surface waters which drained from the Betts area flowed northwardly through the eight-inch culvert underneath the Betts road, without any damage whatever to appellants.

On Sunday, January 20, 1935, appellants, who resided in Seattle during the winter months, visited their country place, which is the property involved here.

There were then six or eight inches of snow on the ground, but no damage to their property had occurred. Their next visit to the property was on the following Sunday, January 27, 1935. In the meantime, on January 21st, there had been a sudden thaw, accompanied by a heavy rain.

When appellants visited their property on January 27th, they found that water from some source had washed a large gully along the course of the old skid road situated on their land. The washout thus made was approximately 235 feet long, 35 feet wide, and from 10 to 20 feet deep. A number of trees had been uprooted and had fallen into the gully. Three or four thousand yards of earth had been washed out onto the beach, forming a kind of peninsula covering an area of about two hundred fifty by one hundred feet. A computation of the earth deposited on the beach disclosed that it exceeded the amount that came from the gully itself, indicating that a part of the earth had been carried from a point further up. The little stream which formerly ran along the depression formed by the old skid road had been enlarged many times, and water was then freely flowing therein.

The appellant husband, accompanied by a witness, traced the source of the water and found that, at the junction of the Hall and Betts roads, an eighteen-inch culvert had been recently installed, permitting the water to flow in large volume from the ditch paralleling the Betts road toward and underneath the Hall road. It appears that the new culvert had been installed by the county on or about January 20, 1935, for the express purpose of carrying underneath and across the Hall road the surface waters which normally and naturally drained from the Betts area northwardly into the ditch running alongside the Betts road. The waters emptying through the eighteen-inch culvert

formed a distinct channel for a short distance and then faded out as they spread and became diffused upon a terrain covered by underbrush and honeycombed with mountain-beaver holes.

On account of the slope of the ground in that vicinity, the water naturally drained into the basin or swamp above mentioned, the deepest part of which was at its southern extremity lying near appellants' land. Any increase of water in the basin naturally found its outlet through the artificial ditch leading therefrom toward the old skid road running through the land of appellants. At the time that the appellant husband and the accompanying witness made their inspection, the water was pouring through the eighteen-inch culvert, while none was flowing through the eight-inch culvert midway in the Betts road.

It appears that, in December, 1933, which was after the Betts road had been built, but before the eighteen-inch culvert had been installed, a slide had occurred on the property north of appellants' land and, in consequence thereof, the owner of that land had moved his house further back to the east. At the time that this slide occurred, there had been an unusually heavy rainfall, and, as a result, there had been a small slide of earth on appellants' land, near the mouth of the little stream coursing along the old skid road. A few trees had toppled over, but other than that, there was no damage to appellants. So far as is known, there had been no other slides nor any washouts upon appellants' land prior to that time.

After making repeated complaints, both written and oral, to the proper county authorities, concerning the damage done and also concerning what would likely recur under the conditions then existing, and after taking an assignment from their vendors of all claims

for damages to the property, the appellants brought this action for the relief requested.

The answer of the respondent consisted of a general denial and also an affirmative defense to the effect that any damages which appellants suffered were the result of an unusual and unprecedented rainfall, which the respondent could not, in the exercise of reasonable care and diligence, have foreseen and guarded against in the construction and maintenance of its highway system.

The theory of appellants' case is that the damage to their property was caused by the wrongful acts of the county in diverting the surface waters which originated upon the Betts area away from the course of their natural drainage, conducting them through the barrier ridge which protected appellants' property, and discharging them through the eighteen-inch culvert onto a hillside which naturally drained into the basin or swamp above appellants' property, as a natural consequence of which, the overburden of water in the basin escaped through the ditch at its south end and flowed in a torrent over appellants' land, causing the destruction complained of.

The theory of the respondent is that appellants' property is a focal point for large quantities of water; that the land is of sliding material; that, in the winter months, the ground becomes saturated with water and, because of its topography, is subject to slides; that the heavy snow on January 20, 1935, followed by a steady downpour of rain, formed a sea of water which, because of the slope of appellants' land, poured into and along the bed of the old skid road, loosening the earth and carrying it forward in a mass; that these waters had their sources on the hillside back of appellants' land; and that the havoc created was wholly unaffected by waters draining from the Betts area and flowing upon the land bordering appellants' property.

These two theories, respectively, were the interpretations of two opposing engineers, both of whom were men of experience and prominence. The two theories were, of course, widely divergent, and the court was put to the choice of adopting one or the other. As to the actual facts of the case, however, there was little, if any, material dispute.

The law applicable to the case, we think, is expressed in two principles, both of which were referred to in the court's memorandum decision.

■ The first principle is this: One on whose land surface and outlaw waters flow, may not collect such waters in drains or artificial channels and cast them on the lands of others, or so near thereto that they will find their way thereon, to the damage of others. *Peters v. Lewis*, 28 Wash. 366, 68 Pac. 869; *Noyes v. Cosselman*, 29 Wash. 635, 70 Pac. 61, 92 Am. St. 937; *Sullivan v. Johnson*, 30 Wash. 72, 70 Pac. 246; *Rohsnagel v. Northern Pac. R. Co.*, 69 Wash. 243, 124 Pac. 900; *Holloway v. Geck*, 92 Wash. 153, 158 Pac. 989; *Whiteside v. Benton County*, 114 Wash. 463, 195 Pac. 519; *D'Ambrosia v. Acme Packing & Provision Co.*, 179 Wash. 405, 37 P. (2d) 887; *Ulery v. Kitsap County*, 188 Wash. 519, 63 P. (2d) 352; 3 Farnham, Waters and Water Rights, pp. 885, 886; 3 Kinney on Irrigation and Water Rights (2d ed.), p. 2969.

Nor does it make any difference whether the waters are cast immediately upon the land of a complaining owner or upon lands from which they inevitably flow onto his land. The proximate cause is the original wrong in diverting the water so as to cause the harm. *Wendel v. Spokane County*, 27 Wash. 121, 67 Pac. 576, 91 Am. St. 825.

■ The other principle is this: When two causes combine to produce an injury, both of which are, in their nature, proximate and contributory to the injury,

one being a culpable negligent act of the defendant, and the other being an act of God for which neither party is responsible, then the defendant is liable for such loss as is caused by his own act concurring with the act of God, provided the loss would not have been sustained by plaintiff but for such negligence of the defendant. The burden of proof, however, is upon the defendant to show that the loss is due solely to an act of God. *Mulrone v. Marshall,* 35 Mont. 238, 88 Pac. 797; *Raish v. Orchard Canal Co.,* 67 Mont. 140, 218 Pac. 655; *Chicago, R. I. & P. R. Co. v. McKone,* 36 Okla. 41, 127 Pac. 488, 42 L. R. A. (N. S.) 709; *Miller v. Mobile & Ohio R. Co.,* 265 Ill. App. 414, 418; *Atlantic Coast Line R. Co. v. Hendry,* 112 Fla. 391, 150 So. 598; *Willie v. Minnesota Power & Light Co.,* 190 Minn. 95, 250 N. W. 809, 811; 45 C. J. 926, § 489; 27 R. C. L. 1107.

Having these principles in mind, we are of the opinion that appellants established a case of liability on the part of the county and that respondent failed to meet the burden assumed by it in its affirmative defense. We are also of the opinion that the court, when put to the election of a theory concerning the cause of the injury, did not accept the more logical and convincing hypothesis.

The record leaves little room for doubt that, during the period involved, an enormous amount of water drained from the Betts area into the ditch along the south side of the Betts road. It is conceded that, normally, such waters would drain northwardly, away from appellants' land, and, unless diverted, would not reach their land at all. The ditch was purposely extended through the natural barrier, and a large eighteen-inch culvert was deliberately placed by the county under the Hall road. The fact is, and the court expressly found, that the purpose of the county in installing the culvert was to carry the surface waters

from the Betts area underneath and across the Hall road and discharge them upon the transverse side of the ridge. It is admitted that, when so discharged, the waters would ultimately and naturally drain into the basin or sink lying between the hills and, in consequence, would flow out through the artificial ditch at its southern extremity onto the land of appellants.

Every logical inference from the facts established by the evidence points unerringly to the source of the waters, or at least a large part of them. The initial wrong was committed when respondent, by means of its ditch and culvert, diverted the waters from their natural course and cast them upon lands whose topography was such as to make appellants' land their inevitable recipient. Appellants' case falls squarely within the first principle of law above announced.

Considering the unusual snowfall, the sudden thaw, and the heavy rain as acts of God, and assuming that a part of the waters which caused the damage came from the hillside in the rear of appellants' land, the burden was, nevertheless, upon the respondent to show that the damage to appellants was wholly unaffected by the waters which came from the Betts area. But, as already suggested, we are convinced from the record that this burden of proof was not met by respondent.

If the waters from the Betts area were not a potent factor for immediate havoc, the respondent would hardly have availed itself of the means that it did to escape the risk of having its roads inundated and washed away. By installing the eighteen-inch culvert, respondent shifted from itself the possibility of sustaining damage, and cast the risk upon appellants. It cannot now attribute the damage to another cause over which it had no control, without assuming and meeting the burden of showing either that its own act was not a contributing cause or else that the damage

to appellants would have occurred regardless of anything that respondent did.

We have carefully considered the reasons assigned by respondent's expert witness and his theory of the cause of the damage. That theory, if accepted, would probably absolve the respondent from liability. But the witness did not see the premises at the time that the damage was wrought. His testimony, given in the form of an opinion as to a past event, was based on information derived from a survey of the land made by himself many years ago and a more detailed inspection made by him ten months after the occurrence. On the other hand, appellants' expert witness had a much better opportunity to evaluate the contributing causes, inasmuch as he visited and carefully investigated the situation within a reasonably short time after the damage occurred. In our opinion, the outstanding facts of the case, as shown by the evidence, afford a very substantial basis for the conclusions reached by him.

In a case involving a somewhat similar situation, the United States supreme court used this language:

"It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly and when their conclusions rest on estimates upon the correctness of which the court, without technical knowledge, can not undertake to pass. In such cases, the court looks about for outstanding facts from which the lay mind can safely draw inferences as to their probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions." *North Dakota v. Minnesota,* 263 U. S. 365, 44 S. Ct. 138, 68 L. Ed. 342.

We appreciate the fact that the trial court made findings in the case, and we are mindful of the rule that such findings are to be treated as verities unless the

evidence clearly preponderates against them. But, in this case, the findings, except those which adopt the theory of respondent's expert witness, are all consistent with a conclusion favorable to appellants. With respect to the opinions of the expert witnesses, we are in the same position as was the trial court in accepting that theory which is the most persuasive, since, after all, no question of credibility is involved, and it is only a matter of drawing conclusions from the facts shown and concerning which there is no material dispute.

We are convinced that the second principle of law above announced converges with the first, upon the evidence adduced, and makes a case of liability on the part of the respondent.

The judgment is reversed, with direction to the trial court to determine from the evidence already submitted, or from additional evidence, if the court deem it necessary, the amount of damages sustained by appellants, and to enter judgment accordingly.

MAIN, TOLMAN, BEALS, BLAKE, and ROBINSON, JJ., concur.

MILLARD and GERAGHTY, JJ., dissent.

HOLCOMB, J. (dissenting)—The opinion of the majority is erroneous upon any theory. The trial judge found as a fact that there was no damage in this case by any wrongful act or negligence on the part of respondent in constructing the highway.

In *Ulery v. Kitsap County,* 188 Wash. 519, 63 P. (2d) 352, the trial judge, upon conflicting facts, had made findings that the land was damaged by improper construction of the highway by the county and assessed the damages. The trial judge's theory in this case was correct and upon conflicting testimony against which there is no preponderance.

476

The trial judge accepted the testimony of the expert witness for respondent as being the more credible and reliable; and whether, in the opinion of the majority, the other expert witness should be considered the more credible and competent, is not within our function to determine. That was solely a question for the trial judge.

The judgment should be affirmed.