# Richmond

## STATE HIGHWAY COMMISSIONER OF VIRGINIA v. RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY.

March 8, 1971.

Record No. 7313.

Present, All the Justices.

*Paul D. Stotts; Kelly E. Miller* (*Andrew P. Miller, Attorney General,* on brief), for plaintiff in error.

*David S. Antrobius* (*Urchie B. Ellis,* on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

This case is sequel to *Railroad Company* v. *Fugate*, 206 Va. 159, 142 S.E.2d 546 (1965). There, Richmond, Fredericksburg and Potomac Railroad Company, in an original petition for mandamus, sought to compel Douglas B. Fugate, State Highway Commissioner of Virginia, and the Board of Supervisors of Henrico County to institute eminent domain proceedings to ascertain the damage allegedly

caused to railroad property in the construction of certain public facilities in Henrico County. We denied the writ.

The railroad company then filed in the trial court a motion for declaratory judgment against the Highway Commissioner alone. The motion alleged that the Highway Commissioner, in constructing a segment of Interstate Highway 64 in Henrico County, and the Board of Supervisors, in making certain public improvements in the area, had widened, deepened, and partially relocated two streams, Horsepen Branch and Upham Brook, whose converged waters flowed under the railroad company's roadbed through an arch culvert.

The motion further alleged that as a result of the improvement work performed by the public authorities on the two streams, an increased volume and velocity of surface waters would, during periods of storm, be cast upon the railroad company's property, necessitating the installation of additional culverts under the roadbed to accommodate the increased flow. The motion prayed for judgment declaring that the railroad company had suffered damage and fixing the proportion of such damage caused by the acts of the Highway Commissioner.

A jury was empaneled, and it returned its verdict in the form of answers to special interrogatories submitted by the court. The jury found that the railroad company had suffered damage "resulting in the necessity of installation" of two additional culverts, each 120 inches in diameter, and that the construction of Interstate Highway 64 by the Highway Commissioner had caused 95 per cent of such damage.

The trial court entered judgment declaring the rights of the railroad company in conformity with the jury's findings. Accordingly, the Highway Commissioner was ordered either to compensate the railroad company for 95 percent of the cost of the additional culverts or to institute eminent domain proceedings against the railroad company "to ensure its compensation for such damage." We granted the Highway Commissioner a writ of error.

The record shows that the two streams involved, Horsepen Branch and Upham Brook, are natural watercourses flowing generally in an easterly direction. In times of storm, the streams drain a watershed of approximately 4600 acres in an area of Henrico County west of Richmond. Land in the watershed is highly developed with subdivisions, apartment houses, shopping centers, and industrial projects.

The railroad company's line runs generally north and south through the watershed. At the location in question, the tracks are located

atop an embankment 30 to 35 feet high. Horsepen Branch and Upham Brook converge "approximately a thousand feet" west of and upstream from the railroad, and the single stream so formed flows under the embankment through a "brick arch culvert" constructed in 1907.

Staples Mill Road, or U.S. Route 33, runs through the watershed west of and roughly parallel to the railroad line. The road crosses Horsepen Branch and Upham Brook immediately upstream from their point of convergence.

New Interstate Highway 64 crosses both the railroad and Staples Mill Road in the area where Horsepen Branch and Upham Brook meet. Proceeding westerly and upstream, the new highway follows generally the course of Upham Brook through the watershed.

To connect the new interstate highway with Staples Mill Road, the Highway Commissioner constructed an interchange west of and upstream from the railroad company's arch culvert. Large areas of land were cleared, graded, and filled, and road surfaces were paved.

In constructing the interchange and the interstate road, the Highway Commissioner made some improvement in the drainage facilities of Horsepen Branch, but the principal upstream work involved Upham Brook. The bed of the latter stream was deepened in some places and widened in others. Its channel was straightened in a number of places and its length was accordingly shortened. Trees and undergrowth were removed from its banks.

Austin Brockenbrough, a civil engineer appearing as a witness for the railroad company, testified to the results of the construction and drainage improvement work performed by the Highway Commissioner. Mr. Brockenbrough put the results in terms of the "peak stream discharge" at the railroad company's arch culvert based upon an unusually heavy storm in August, 1959. The witness stated that with the Highway Commissioner's improvements in place, the "peak stream discharge" would be 7470 cubic feet per second, but absent the improvements, such discharge would be 6140 cubic feet per second, or a difference of 1330 cubic feet per second. This difference in flow, said the witness, necessitated the provision for two 120-inch culverts under the railroad embankment to supplement the existing arch culvert.

The railroad company urges us to adopt, as the trial court adopted, a per se rule of damage under § 58 of the Constitution[1] which would

---

1 ". . . The General Assembly . . . shall not enact any law whereby private property shall be taken or damaged for public uses, without just compensation. . . ."

provide "landowners a remedy in *every case* for *all damage* to private property for public uses." Under such a rule, the railroad company argues, it would be entitled automatically to compensation merely upon showing that it was damaged by the acts of the Highway Commissioner without regard to whether such damage would be considered compensable in a dispute between private landowners.

Alternatively, the railroad company contends that it would be entitled to compensation even if the Highway Commissioner had been occupying a private status when he performed the acts complained of. The argument is that the Highway Commissioner, as an upper riparian proprietor, had no right to "collect water into an artificial channel or volume *or* precipitate it in greatly increased or unnatural quantities upon his neighbor to the injury of the latter." The railroad company says that the Highway Commissioner is not relieved of liability, as he asserts, by showing that the construction work was "reasonable" and that "the stream was returned to its natural channel" before leaving highway property.

We do not, however, reach the questions posed by the foregoing contentions of the railroad company. The damage the railroad company claims it has suffered in this case was not the result of the acts of the Highway Commissioner but of the railroad company itself.

The railroad company says that it was damaged because the acts of the Highway Commissioner caused it "to expend money to install additional culvert capacity in view of the possibility that its roadbed might be washed out." The evidence, however, shows otherwise and establishes conclusively that long before the Highway Commissioner performed any of the acts complained of, the railroad company's arch culvert was wholly inadequate to carry off the storm waters flowing through the natural watercourse to the railroad embankment. Because of the inadequacy of the culvert, the waters flooded the banks of the watercourse, "ponding" upon lands owned by others. On at least one occasion, in the storm of August, 1959, the "ponding" waters even covered Staples Mill Road, more than 1000 feet upstream from the arch culvert.

The railroad company argues, however, that the "ponding" was "within good engineering practice" and because of the "ponding," the arch culvert was "adequate to handle the surface water coming to it" before the highway construction took place upstream. But while ponding might be "good engineering practice," it is not good legal practice when the lands of others are flooded as a result.

We are dealing here with the law applicable to a natural

watercourse. That law says that a lower riparian owner, including a railroad company, may not so obstruct such a watercourse as to cause surface waters flowing therein to flood the lands of upper owners, whether the flooding results from usual periods of rainfall or from those unusually heavy periods which should be anticipated because they have occasionally occurred in the past. *So. Ry. Co. v. Neal*, 146 Va. 229, 233, 135 S.E. 703, 704 (1926).

■ That the arch culvert was not adequate and that this inadequacy was the real cause of the railroad company's claimed damage may be shown in two ways.

The additional culvert capacity the railroad company says it needs because of the highway construction consists of two 120-inch culverts, each having an opening of 78.5 square feet. Those culverts are claimed to be required to carry off the 1330 cubic feet per second of additional water, caused by the highway construction, which will reach the railroad embankment at "peak stream discharge." If that capacity is needed for that amount of water, then the arch culvert, having an opening of only 214 square feet, could not possibly be adequate to carry off the 6140 cubic feet per second of water which would reach the culvert in the absence of the highway construction. Mathematical calculations based on the foregoing figures show that 6.5 120-inch culverts, in addition to the existing arch culvert, would be required to carry off the water about which the railroad company makes no complaint. So the additional culvert capacity for which compensation is sought from the Highway Commissioner is only part of what would be needed in the absence of the highway construction.

To prove the point another way: The railroad company contends that it has suffered damage because the increased flow resulting from the highway construction will cause the water reaching the arch culvert at "peak stream discharge" to rise above an elevation of 175.2 feet above sea level. The railroad company says that at an elevation of 175.2 feet, the water does no harm to railroad property, but that above such elevation, there is "the possibility that its roadbed might be washed out." The record shows, however, that the 6140 cubic feet per second of water that would be present at the arch culvert in the absence of the highway construction would reach the 175.2-foot elevation and would then be 10 feet above the top of the culvert and "ponding" upon lands of others. This is what occurred in the storm of 1959. Assuming adequate culvert capacity to carry off the storm waters in the absence of the highway construction, the increase of

1330 cubic feet per second of water resulting from that construction could not possibly cause "ponding" to an elevation above 175.2 feet and would not, therefore, harm railroad property. So the increased water resulting from the acts of the Highway Commissioner did not cause the damage the railroad company now claims.

The judgment appealed from will be reversed and final judgment entered here in favor of the Highway Commissioner.

*Reversed and final judgment.*