[No. 14023.   Department One.   November 20, 1917.]

## BENJAMIN R. SOUTH, *Respondent*, v. SEATTLE, PORT ANGELES & WESTERN RAILWAY COMPANY, *Appellant*.[1]

APPEAL—REVIEW—DISCRETION—NEW TRIAL.   The denial of a motion for a new trial on account of the insufficiency of the evidence will not be disturbed on appeal except for clear abuse of discretion.

MASTER AND SERVANT—INJURY TO SERVANT — NEGLIGENCE — SAFE PLACE—DUTY TO INSPECT—EVIDENCE—SUFFICIENCY.   In an action by a locomotive fireman to recover for personal injuries sustained when piling in a trestle gave way under the weight of a locomotive, the jury's finding of negligence in failing to inspect the piling is sustained where it appears that the piling was honeycombed with teredos, that the trestle had been constructed 19 or 20 months, the presence of teredos in the harbor was well known, and the defective condition of the piling was indicated by the fact that piling had disappeared, no inspection was made to discover the cause, and the condition of the piling could have been discovered by a reasonable inspection; notwithstanding evidence that an inspection of some of the piling had been made and the evidence of a witness that piling should last for a period of three years.

Appeal from a judgment of the superior court for King county, Smith, J., entered September 21, 1916, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a locomotive fireman through the collapse of a trestle.   Affirmed.

*George W. Korte, Corwin S. Shank,* and *H. C. Belt,* for appellant.

*Griffin & Griffin,* for respondent.

WEBSTER, J.—Plaintiff brought this action to recover damages for personal injuries alleged to have been sustained by being precipitated into Port Angeles bay by the collapsing of a railroad trestle under the weight of a locomotive upon which he was employed as fireman.   The complaint sets forth the charge of negligence as follows:

[1]Reported in 168 Pac. 896.

"That the defendant wrongfully, carelessly and negligently failed to have the place at which said locomotive was precipitated inspected, examined and repaired; that the piling and trestle at said point was constructed of small, weak, old, decayed piling, which said piling was eaten and weakened by teredos and submarine growths; that there was an insufficient number of piling, piles and support to support the said trestle and that the same was wholly insufficient to support the weight of the locomotive, which was then upon said piling by and under the directions of the defendant, its officers and agents; that said locomotive which fell and was precipitated when said piling gave way, was a large, heavy locomotive and that said piling and trestle were wholly insufficient to support the same; that said defendant wrongfully, carelessly and negligently failed to notify or warn the plaintiff of the dangerous condition of said trestle or that the same was weak and did nothing to notify the plaintiff of the danger of working upon said locomotive or upon said trestle; that the defendant wrongfully, carelessly and negligently failed to have said piling protected by having said trestle treated with creosote or protected in any manner from teredos eating and weakening the same and wrongfully, and carelessly failed to have said trestle and piling properly braced."

The plaintiff prayed damages in the sum of $25,000. The defendant admits the employment of the plaintiff as its fireman and that the locomotive upon which he was working left the track and fell into the waters of the harbor, carrying the plaintiff with it, but denies that it was in any wise negligent. No affirmative defenses were interposed. After a trial before a jury, a verdict was returned in favor of the plaintiff for the sum of $16,000, which, upon motion for new trial, was reduced by the court to $10,000, and judgment was entered accordingly. The defendant appeals, seeking reversal upon the grounds that the court erred in denying its motions for nonsuit, for a directed verdict, and for a new trial. The assignments are rested upon the contention that the plaintiff failed to establish negligence on the part of the

defendant, and present the single question of the sufficiency of the evidence to support the verdict.

The positive, nondelegable duty of the master to exercise ordinary care and diligence to furnish his servants a reasonably safe place in which to work and, by proper and reasonable inspections from time to time and by the use of ordinary care in making repairs, to keep the place in a reasonably safe condition, is well understood and needs no elaboration. It is likewise well settled that this degree of care is commensurate with the dangers to which the servant is exposed. It is equally elementary that what is reasonable care in a given case is always a question for the jury whenever, upon the evidence adduced, reasonable minds might fairly reach different conclusions, and that, upon motion for nonsuit or for an instructed verdict, the plaintiff is entitled to have weighed in his favor every reasonable inference to be deduced from the evidence. It is also well to have in mind that:

"The motion for a new trial invokes, on the other hand, a compound of the discretionary and judicial functions of the trial court. Both the discretion and the attendant responsibility of its exercise are vested by statute in the trial court, not in this court . . . Where the motion is based upon the claim of insufficiency of evidence, the trial court alone possesses the power to weigh the evidence and, in its discretion exercised thereon, either to grant or deny the motion. The powers of this court are confined to a consideration of the evidence only in review of that exercise. This is not a court of first instance. We can only interfere with the exercise of the discretion of the trial court in granting or refusing to grant a new trial in such a case where there has been a clear abuse of discretion." *Brown v. Walla Walla,* 76 Wash. 670, 136 Pac. 1166.

The drift of the trial was such that, under the evidence, the question in the case is whether the defendant exercised reasonable care and prudence in inspecting the trestle and in keeping it in a reasonably safe state of repair for the purpose for which it was being used. This duty is nowhere

better defined than by Labatt in his work on the law of Master and Servant:

"The character of the inspection which the master is bound to make is described by various epithets and phrases, all of which, as will be seen from the subjoined note, are essentially the logical equivalent of the proposition that the examination must be such as a person of ordinary prudence would have made under the circumstances. The question whether the examination to which the instrumentality which caused the injury was actually subjected before the accident was such as to satisfy the standard thus indicated is primarily one for the jury. This principle is not affected by the fact that the preponderance of the testimony, whether measured by the number of the witnesses or the comparative credit which the court may think to be due to each, is in favor of one litigant.

"Whether or not the duty of a master with regard to proper inspection has been performed by the application of any given test is to be determined by considering whether that test will give indications as to the actual condition of the instrumentality in question. In the application of this principle the courts have usually proceeded upon the theory that a merely visual or ocular inspection of external conditions does not satisfy the full measure of a master's obligations, where the servant's safety depends upon the soundness of the material of which an instrumentality is composed, or upon the firmness with which the separate parts of an instrumentality are attached to each other, or upon the stability of some heavy substance." 3 Labatt, Master and Servant (2d ed.), p. 2813.

Again, at page 2808, the same author states:

"In view of the natural tendency of an inorganic instrumentality to become less and less safe the longer it is used, a court will not set aside a verdict for the servant which is based upon the theory that the failure to inspect it was culpable, where the evidence shows that it had been a part of the master's plant for such a period that, taking into account the nature of the materials of which it was composed, the functions it was performing, and the various influences to which it was exposed by climatic changes or physical forces, it is not an unreasonable inference that a prudent ·

man would have examined it for the purpose of ascertaining what its actual condition was."

In the light of these familiar principles, we shall briefly review the rather voluminous evidence in the case. The defendant operates a spur which leaves its main line near the center of the city of Port Angeles and extends around the head of the bay and thence, by wooden trestle, over the tide flats into deep water, where a log dump is maintained. The spur was built to serve what is known as the Earles Mill, and the piles were driven and the log dump constructed in May or June, 1914. From the shore to low water mark, there were nineteen or twenty bents of four piles each, and from that point to the log dump, there were ten or eleven bents of five piles each. The bents were sixteen feet apart and the piles were untreated, "winter cut, bark stuck piles," about fourteen inches in diameter at the top, and about ten inches in diameter at the bottom. The piles were capped with fourteen by fourteen inch timbers, with heavy stringers under each rail. Across the stringers, ties were placed, upon which the rails rest. The log dump proper, which was in about eight feet of water at low tide, consists of ten bents of creosote treated piles. Trains loaded with logs would back out on the trestle to the dump, where the logs were unloaded into the bay by means of an apparatus called a "whirligig." In the afternoon of January 28, 1916, the logging train backed onto the trestle to unload. After the logs had been dumped into the water, the locomotive started to move ahead, at which time three bents in the trestle next adjoining the log dump suddenly gave way, causing the locomotive to be precipitated into the bay, a distance of about sixteen feet. Later, upon examination, it was found that the piling at this point, down near the mud line and extending upwards about four feet, had been completely honeycombed by teredos and was in a soft and spongy condition. McGregor Ross, a fisherman who lived on a sand spit about one hundred feet from the place where the engine

went down, was an eyewitness to the accident. He testified that he was standing in his cabin door watching the men at work on the trestle, when the engine left the track and fell into the water. In falling, the engine turned and fell on the side of the trestle next to the shore line. About two months or more prior to the accident, he observed a pile which was loose from one of the caps and leaning in the direction of his cabin. It remained in this condition until several days before the accident, when it completely disappeared. This pile was on the side next to the shore and was out at the exact point where the locomotive and tender fell.

E. F. Kaufman, also a fisherman living on the sand spit about five or six hundred feet from the place where the trestle gave way, testified to substantially the same facts, save that, according to his testimony, the pile had been loose from the cap, to his knowledge, for about six weeks prior to the accident. There was nothing to prevent one under the trestle from seeing the pile during the time it was loose from the cap and leaning out about two feet at the top. Mrs. E. F. Kaufman corroborated the testimony of her husband in all of its material aspects. Mr. Merrill, the bridge foreman and pile driver operator in the employ of the defendant, testified that, about the first of December, 1915, he discovered that a pile was out of the trestle near the dump on the side next to the bay. He immediately went to the office of the defendant and reported that it was dangerous for locomotives to pass over the trestle at that point, and later put up a danger or stop sign some distance, perhaps three or four bents, from the place where the pile was missing. During the time the trestle was in this condition, the defendant placed two empty cars or "idlers" in the log train next to the engine, in order to keep the locomotive, which with its tender weighed about one hundred and fifty tons, from passing over the weak place in the trestle. About December 8 or 9, the pile which was out of the trestle on the side next to the bay was replaced and another pile was driven to take the place of one

which was not supporting the trestle, the cap above it having been broken off. Some fender piles also were driven at that time to prevent logs from striking and damaging the bearing or foundation piles. When this work was completed, the danger sign was removed. It is not claimed that any piles were replaced on the side of the trestle next to the shore, the defendant maintaining that there was no piling missing or out of repair on that side. The conductor in charge of the train drawn by the locomotive which fell into the bay testified that, with one pile out of a bent, the trestle was considered unsafe and this was the reason the danger sign was put up by Mr. Merrill.

While some of defendant's witnesses undertook to say that the missing pile on the side next to the bay had been "knocked out" of the trestle, this testimony was purely surmise and conjecture. It is plain from the record that the cause of this pile going out was not known. It is an established fact in the case that one of the surest indications that teredos are eating and damaging piling at a given place is for some of the piles to disappear. Notwithstanding this, the bridge foreman testified that no examination was made at that time to ascertain the condition of the piling as to whether it had been seriously damaged by teredos.

"Q. Mr. Merrill, did you in fact examine the piling to see whether the teredos were at work on it? A. No, I did not."

The piling supporting the trestle at the point where the locomotive went through was at all times partially under water, and it is not disputed that teredos do their greatest damage near the mud line on piles so submerged.

Herbert Long, defendant's roadmaster, testified:

"Q. You know there was a cause for this engine going down into the bay? A. I do. Q. What was the cause of it? A. Teredos eating piles off under the water. Q. Were they completely eaten off? A. They were honeycombed. Q. But you did not make any inspection down underneath the

water?  A. No, sir, I did not.  Q.  So that your inspection did not amount to anything?  A. No, but as far as the structure was concerned, the alignment and everything was there."

It is an exceedingly significant fact that, on the side of the trestle next to the shore, there were no logs or booms and consequently no heavy objects to strike against the piling and knock it out, and yet it was on this side that a pile had completely disappeared some days before the accident, according to the testimony of three witnesses.

"If any conditions visible upon a superficial examination indicate that there may be defects, only discoverable by a closer inspection, it is the duty of the employer to make such an inspection.  This rule is sometimes applicable so as to charge him with negligence in failing to examine some particular part of an instrumentality, although the visible indications of danger were confined to other parts."  3 Labatt, Master and Servant (2d ed.), p. 2708, § 1061.

See, also, *Hall v. Emerson-Stevens Mfg. Co.*, 94 Me. 445, 47 Atl. 924.

The only examination of the piling, other than the one made by Mr. Welch, to which we shall presently refer, consisted of going along and looking at the trestle from underneath.  This counsel for appellant characterize as a "visual inspection."  Obviously such an examination would not disclose the condition of piling which was at all times under water, and "the courts have usually proceeded upon the theory that a merely visual or ocular inspection of external conditions does not satisfy the full measure of a master's obligations where the servant's safety depends upon the soundness of the material of which an instrumentality is composed."

S. J. Welch, defendant's bridge inspector, having charge of inspecting all of the bridges, culverts and trestles on the main line of the Chicago, Milwaukee & St. Paul road and all of its subsidiary branches west of Mobridge, South Dakota, testified that he examined the trestle at Port Angeles on

November 5, 1915. His duties are best described in his own language:

"Once a year, I start at Mobridge and I examine every bridge, and every culvert on the entire division, every pile, every stringer, every pile cap, ties, braces, overhead construction and everything."

He testified that, on the date mentioned, he made quite a careful inspection of the trestle, save that he did not examine the four or five bents immediately next to the log dump below low tide. These were the piles which gave way, precipitating the locomotive into the harbor, and the damage causing them to break was at a point below low tide. He said that he discovered no indications of teredos, and that the trestle seemed to be safe and in good condition. It is conceded that, on January 28, 1916, the piles at the point where the trestle gave way were completely honeycombed and in a spongy condition. Inasmuch as only two months and twenty-three days had elapsed between the inspection by Mr. Welch and the accident, it seems quite plain that the thoroughness of the examination made by this apparently much overworked man is challenged by uncontradicted facts and circumstances.

But counsel for appellant argue that no inspection whatever was required. They insist that the railway company was justified, as a matter of law, in relying upon the history of the life of piling used in the water of Port Angeles harbor; that experience had demonstrated that piling of the kind of which the trestle was constructed would maintain its normal bearing strength for a period of at least three years, and that these piles had been driven only nineteen or twenty months. This contention is predicated upon the testimony of defendant's division engineer to the effect that, prior to the construction of the trestle, he had made a study of the life of piles of various kinds in the waters of Port Angeles harbor for the purpose of ascertaining the character of piling that should be used in the trestle and the length of

time each would last. That, as a result of this investiga-
tion, he concluded that piling such as was used in the trestle
would last not less than three years. The record shows that
his efforts in this connection consisted of inquiring of per-
sons operating docks and those engaged in logging and pile
driving in the harbor what their experience and observation
in the matter had been. He said:

"I satisfied myself at that time that from the statements
of the different ones I talked to, logging and operating in
there, that the untreated, bark stuck pile, winter cut pile,
was good for three years, that is, not less than three years;
from three to six years."

Several witnesses residing at Port Angeles also testified
that this had been the result of their observation and ex-
perience. On the other hand, plaintiff called as an expert
Mr. T. E. Jones, who had been extensively engaged in driv-
ing piles in the waters of Puget Sound for about thirty years.
He testified that he knew the action of teredos and sub-
marine growths upon piling in the Sound and in its bays
and tributary waters; that the "ordinary life of an unpro-
tected, what we call bark stuck pile, is about one year." In
addition, he gave the following testimony:

"Q. Well, have you driven and renewed trestles which are
used in the operation of railroad trains? A. For about
thirty years. Q. Do you know the length of time those
trestles are allowed to remain without being repaired? A.
Yes, I have driven them for some of the largest concerns
here; for the Pacific Coast people and for the Moran people.
Q. How long do they allow piles to remain in salt water.
That is, unprotected piles? A. I drove for the Pacific Coast
Company, at that time it was the Oregon Improvement Com-
pany. I drove their fender piles around the dock annually.
Q. Every year? A. Every year. Q. What would you say
as to the time piles may be ordinarily depended upon to last,
supporting a wooden railroad trestle in salt water? A. Well,
I don't believe they are safe for more than a year. In some
places, now, in shallower water where the tide is entirely out,
they last longer than that."

Manifestly, in the light of this evidence, the court would not be justified in saying, as a matter of law, that the piling upon which the trestle rested would be safe for three years and, therefore, that no duty of inspection devolved upon the defendant during that period.  True, Mr. Jones said that he had never driven piles in Port Angeles harbor and that the life of piling varied somewhat in different localities, but this went to the weight and not to the competency of his testimony.

Considerable stress is laid upon the fact that he testified that, in the harbor at Shelton, Washington, piling at one time lasted much longer than it did in later years.  That, when those operating at that point commenced to return boom sticks from the mills, the teredos became much worse and the piling subsequently went out much more rapidly than it did prior to that time.  We are unable to see how appellant can find consolation in this testimony.  If a change of this character had occurred at Shelton, might not a similar change take place at Port Angeles?  If so, what becomes of the argument that the defendant had the right, as a matter of law, arbitrarily to assume that piling in the bay at Port Angeles would last three years?  The very purpose for which the trestle was constructed at Port Angeles was such as to bring about a condition similar to that which caused the change in the life of piling at Shelton.  Not only was the question of the duty to inspect, under the circumstances, one for the jury, but the question of the reasonableness and sufficiency of the inspection, if one was required, was also for it to determine, the testimony in this respect being in sharp and direct conflict.

The defendant's bridge inspector testified that, in examining the trestle, he would look the piling over carefully and, in places where the bark was off, would chop into the pile with a small hammer-headed axe, and that this was the customary and usual method of inspection.  Plaintiff's expert testified that a proper and exceedingly easy way to

inspect piling is to put a peavy on the pile and give it a wrench or twist and, if the piling is honeycombed or spongy, it will "give," but that, in inspecting piling constituting the foundation of docks and railroad trestles, the customary and usual method is to put a line on the pile under examination and run it out to an anchor or donkey engine and surge on it. The question of who was correct on this point depended upon the weight and credit to be given the testimony of the witnesses, and consequently was within the peculiar province of the jury.

To be sure, the defendant is not answerable for latent defects in the trestle which the usual and well recognized tests would fail to detect. This is but another way of saying that the master is not liable for accidents which human skill and experience are not able to foresee and avoid. But it is equally clear that the highly important duty rests upon the master to make reasonable examinations and to apply usual tests for determining the safety of places and things in which and with which his servants are required to work, and the failure to make reasonable inspection and proper repairs is culpable, rendering the master liable for injuries resulting from this dereliction. The fact that the structure or instrumentality was properly and skillfully constructed when originally erected does not change the rule. Time, exposure and the action of the elements are factors to be considered, and, in the light of the circumstances of each case as it arises, it must be determined whether the duty imposed by law has been met and discharged. The trestle had been constructed nineteen or twenty months. The presence of teredos in Port Angeles harbor, as well as their action on piling in waters infested by them, was thoroughly understood. The defendant was operating heavy locomotives in drawing heavily loaded trains many times each day over the piling. The life and limb of those engaged in the work depended upon the trestle being maintained in a reasonably safe condition for the purpose for which it was erected. The piling, at the

place of the accident, was honeycombed by teredos and submarine changes. Prior to the accident, piling had disappeared from the trestle, yet no inspection was made to ascertain the cause. The jury was warranted in finding that, at the time the trestle gave way, a pile was missing at the very point where the locomotive went through, and in falling, it went in the direction of where the pile was out. One pile missing from a bent rendered the trestle unsafe, according to defendant's employees and witnesses. Six weeks or two months prior to the unfortunate occurrence, a pile was loose at the cap and leaned out two feet at the top in such manner as to be plainly seen by those underneath the trestle, and it is not claimed that it was replaced or repaired prior to the accident. Yet, upon the theory that the defendant was not required to inspect the trestle in the first place, but that, if an inspection was necessary, one of the kind we have heretofore described was sufficient, we are invited to hold, as a matter of law, that there is no liability on the defendant. This we cannot do. The trial court properly denied the motions for nonsuit and for a directed verdict, and palpably there was no abuse of discretion in denying a new trial.

The judgment is affirmed.

ELLIS, C. J., MAIN, MORRIS, and CHADWICK, JJ., concur.