[No. 27041. Department One. June 15, 1938.]

BOYD M. TETER *et al., Respondents,* v. OLYMPIA LODGE No. 1, INDEPENDENT ORDER OF ODD FELLOWS, *Appellant.*

A. R. HERBERT *et al., Respondents and Cross-appellants,* v. OLYMPIA LODGE No. 1, INDEPENDENT ORDER OF ODD FELLOWS, *Appellant.*[1]

[1]Reported in 80 P. (2d) 547.

*Thos. L. O'Leary,* for appellant.

*Neal, Brodie & Trullinger* and *Geo. F. Yantis,* for respondents.

*Leo Teàts* and *Ralph Teats,* for respondents and cross-appellants.

GERAGHTY, J.—The four actions here involved were consolidated below for trial. The plaintiffs in three of the actions sued to recover for property damage sustained by reason of the collapse of the brick walls of a building owned by the defendant. The fourth action was brought by plaintiff Keir individually and as guardian *ad litem* for his minor daughter, Violet Keir, to recover for personal injuries sustained by her.

The causes were tried to the court, sitting without a jury. Separate findings of fact were made in each cause and one judgment was entered, awarding to the plaintiffs severally the sums to which they were ad-

judged to be entitled. The defendant appeals from the judgment. The plaintiffs Herbert and Moody, not satisfied with the amount of damages awarded them, have cross-appealed.

The appellant was the owner of a three-story brick structure, known as the Odd Fellows building, situate at the southwest corner of Capitol way and Fifth avenue, in the city of Olympia. The building was seventy feet in height, had a frontage of sixty feet on Capitol way, and extended along Fifth avenue to a depth of one hundred feet. The first story was occupied by store rooms, the second was used for hotel purposes, and the third was devoted to lodge use. The exterior walls were of brick sixteen inches in thickness to the top of the first floor, and twelve inches above that. The building was erected in 1888, and the brick was laid in lime mortar, cement not being in common use at that time. The respondent Williams owned a one-story building fronting on Capitol way, adjoining the lodge building on the south. It was occupied by the respondents Herbert and Moody, doing business as the Capitol Way Inn, and by the respondent Boyd M. Teter, doing business as the Pantorium Cleaners.

A fire occurred in the lodge building on the night of January 7, 1937. The interior of the building was of wood construction, and most of it was destroyed. The roof and portions of the second and third floors fell in. The fire burned for two days. The naked walls were allowed to stand unsupported after the fire.

On the night of February 16, 1937, forty days after the fire, during a strong wind storm, a large part of the walls collapsed and fell. One witness testified that the walls did not fall as a solid mass, but seemed to crumble into a torrent of bricks. Another witness testified that the walls fell in sections. When the southern wall collapsed, a large part of the brick fell on the

Williams building, crashing through the roof and causing the property damage to the building and its tenants for which they sue to recover; and Violet Keir, an employee in the Capitol Way Inn, sustained the injuries for which suit was brought by her father.

As a basis for recovery, respondents allege in their complaints that the appellant was guilty of negligence in allowing the walls to stand unsupported for forty days after the fire knowing, or charged with knowledge of the fact, that the walls were unsafe. The appellant, in its answer, denied the negligence and alleged affirmatively that the collapse of the walls was caused by a wind of such extraordinary and unprecedented velocity as amounted to an act of God, which could not have been anticipated or provided against.

The primary question is whether the appellant was chargeable with negligence under the circumstances. To say that the collapse of the walls was caused by an act of God, is but another way of denying negligence on the part of the appellant.

That the walls were blown down by a strong wind, can not be questioned, but this fact does not of itself exculpate the appellant. Strong winds were to be expected during January and February, and appellant was under a legal duty to foresee and guard against the possibility of danger from them. If the appellant is liable, it is on the basis of negligence, in that it failed, within a reasonable time after the fire, to take proper precautions to protect against a danger that could be reasonably anticipated from the existing condition of the premises. The appellant would not, of course, be liable if the walls had fallen during the progress of the fire; it would not be liable if they had fallen within such period thereafter as would not have given a reasonable time to take them down or otherwise to insure their safety.

"The question of the liability of a landowner for damage to adjoining premises has frequently arisen in connection with the fall of walls which had been weakened and made dangerous by fire. The general rule is, that where a fire has occurred in a building, destroying the inner portion of the building and leaving the walls, if the owner permits the walls to remain standing, and they thereafter fall, he is liable to the adjoining owner for the resulting damage; for to maintain such a wall after the expiration of a reasonable time for investigation and for its removal, would not be a reasonable and proper use of one's property, as it is the duty of a landowner not to suffer such a wall to remain on his land where its fall would injure his neighbor, without using such care in the maintenance of it as would absolutely prevent injuries, except from causes over which he would have no control, but he cannot be held liable for the injury, or bound to make the structure safe, until he has had a reasonable time, after it has so become dangerous, to take the necessary precaution." 1 R. C. L. 374, § 6.

The appellant contends that it had no notice of the unsafe condition of the walls. Officials of the city, including the building inspector and city engineer, testified that they made an examination of the walls and, finding no cracks in them, concluded they were safe. Another witness, engaged in the manufacture of brick, testified that he had inspected the walls and advised the appellant that, in his opinion, they could safely be permitted to stand. On the other hand, witnesses experienced in brick construction work, called by the respondents, testified that the walls were dangerous, owing partly to the combined effect of fire, water, and freezing weather.

While the city officials testified that they considered the walls safe, their testimony is not persuasive, since it is evident that they were much concerned to have the walls taken down, and notified the lodge officers to that effect. The city engineer testified that the city had

directed the appellant to take the walls down, but did not make a written order, because the lodge was negotiating insurance and expected to take them down anyway.

"Q. Yes, so the letter was not posted. Now, why did the city direct they be taken down? A. Well, no one would want them standing there, would they? They would want them cleaned up. Q. Why not? . . . A. Well, I know I wouldn't want an eyesore like that anywhere. . . . MR. O'LEARY: Mr. Turner, did I understand you to say that the city had informed the Odd Fellows to take those walls down? A. . . . three or four of the committee came up there and we told them after the fire was over that it was their baby, and in fact that is the words we used, and, from there on it was up to them to remove them, protect them with board walks, and so forth. Q. There was no official order they should be taken down? A. It was just a verbal statement."

Now, of course, while the witness said that the city officials were interested in the removal of the walls because they were an eyesore, his testimony implied more than that. When the representatives of the appellant were told that the walls were "their baby," the city officials had in mind the appellant's responsibility for any damage that might result. If the city officials had in mind only esthetic considerations, they would not have expressed the responsibility of the appellant in the language employed.

Since the condition of the building was so challenging, with its naked walls standing to a height of seventy feet without support, it seems to us that the appellant cannot be heard to say it had no notice of the danger and risk attendant upon that condition. A committee had been appointed by the appellant to investigate, and, finally, on February 1st, a resolution was adopted ordering the removal of the walls and the employment of an architect to draw plans for the work. The work

was advertised and bids received by the appellant on February 16th, the night the walls fell.

■ While it is likely the walls would not have fallen on the night of the 16th if it were not for the occurrence of a strong gale, yet we do not conceive that this fact absolves the appellant from responsibility. The occurrence of strong winds in the winter months was reasonably to be expected. We are not persuaded that the wind on the night of February 16th, strong as it was, was so unprecedented as to fall within the definition of an act of God and the sole cause of the collapse. The most that can be said is that the strong wind concurred with the negligence of the appellant in producing the result.

"In order that this rule may apply the act of God must be the sole cause of injury, for if an act of God and the negligence of an individual are concurring causes of an injury, the individual who was guilty of negligence is liable for the injury. One who is under a duty to protect others against injury cannot escape liability for injury to the person or property of such others on the ground that it was caused by an act of God unless the natural phenomenon which caused the injury was so far outside the range of human experience that ordinary care did not require that it should be anticipated or provided against, and it is not sufficient that such phenomena are unusual or of rare occurrence. The fact that one was negligent in failing to take proper precautions against ordinary occurrences will not charge him with liability for an injury caused by an act of God, which would have caused the injury even had proper precautions been taken, but the fact that an injury was actually caused by a natural phenomenon of such unusual nature that it might be termed an 'act of God' will not excuse from liability where precautions which should have been taken to guard against occurrences which should have been expected were negligently omitted and such precautions would have prevented the injury." 45 C. J. 736, § 127.

The chief of the state's forestry department testified that he kept an unofficial record of wind velocity for his own use and information, and that he estimated the velocity of the wind, on the night of February 16th, at his home on Butler's Cove, four and a half miles north of Olympia, at sixty-five miles an hour. He admitted, however, that there could be a material difference between the velocity at his home, exposed as it was to an open stretch of water of fifteen miles or more, and the velocity in the city of Olympia.

The official reports of the government weather service at Seattle, as well as from the station at Lakeview, some twenty miles distant from Olympia, were introduced and showed much lower velocity than that testified to by the state forester. It is significant that there is no evidence in the record of any damage to other buildings or property in the city of Olympia on that night. Mr. Williams, city engineer, testified that, as far as he knew, no other damage had been caused by the storm. A master mariner, who had been engaged for many years in the tugboat business and was then in charge of several tugs and scows, testified that he was aboard his boat, moored at the Olympia Yacht Club, some four blocks distant from the Odd Fellows building, and that, while there was "a good stiff breeze" that night, he had not heard of the storm doing any damage to his employer's equipment. There were forty boats moored at the yacht club that night, but he did not recall any substantial damage done at the moorings.

Our conclusion is that the trial court was fully justified in finding the appellant chargeable with negligence in not taking proper and timely measures to guard against an obvious danger.

The appellant does not challenge the correctness of the sums awarded to the respondents Williams, Teter,

and Keir, in the event the court should hold against it on the issue of negligence. It contends, however, that the damages awarded to the respondents Herbert and Moody are excessive. These respondents, on the other hand, contend, in their cross-appeal, that the court's award is insufficient.

██ Herbert and Moody had occupied the room in the Williams building under a five-year lease, which terminated January 1, 1937. While some negotiations had been under way for a renewal of the lease and a draft of the lease had been given to the respondents by their landlord, it had not been executed and no definite conclusion had been reached when the fire occurred. It was evidently the intention of the respondents to resume operations in the old location, and, in their complaint, they alleged that they would not be able to reopen there before the first of May. A notice of reopening on that date was also posted on the premises. The room was not ready for occupancy before May 1st, although it appears that respondent Teter, doing business as Pantorium Cleaners, reopened in his old quarters April 19th.

Toward the end of April, the respondents determined to reopen in a new location on Fourth avenue, some four blocks distant from the Williams building. Such of the restaurant equipment of the old location as could be salvaged had been put in storage and was later removed to the new location, where the respondents reopened for business July 14, 1937.

In its third finding of fact the court allowed the respondents $5,000 to cover property damage, the cost of advertising, and for loss of profits on account of the interruption of the business. Some sixty-five items of damage, great and small, are enumerated by the court in making up the sum awarded. The court allowed $375 for advertising; $400 for loss of business

in the months of January and February, caused by the reluctance of patrons to enter the restaurant for fear of injury from the standing walls; and $1,600 for loss of profits for the months of March, April, May and June. The remainder, $2,625, was for personal property damage to the restaurant equipment.

The appellant challenges the court's allowance of the item for advertising. On the other hand, the respondents contend they should have been allowed $1,000. Mrs. Herbert, one of the proprietors, testified that it would require the expenditure of $1,000 for radio, newspaper, and other advertising to restore the business, and that contracts aggregating that amount had been made. Her testimony was not very definite as to the time covered by the advertising campaign or other details. To a large extent, the advertising had relation to the new location on Fourth avenue, and was intended to draw patronage there.

Some advertising would have to be done, however, even if the business had been reopened after some months' interruption in the old location. We cannot say that, under the circumstances, the allowance made by the court was unreasonable. The court, in fixing the amount at considerably less than the respondents claimed to have incurred a liability for, doubtless had in mind the fact that a large share of the advertising was rendered necessary by the removal of the respondents to a new location.

A considerable part of the sum allowed for damage to the restaurant equipment was made for items that had no salvage value and could not be used in the new location, such as electric wiring and lighting, ventilation and painting. This expense had been incurred by respondents in equipping the room in the Williams building for the restaurant business. If they had remained in this building, the equipment would

require to be restored at their own expense. Respondents were rightfully in possession of the premises when this damage was sustained by them through the negligence of appellants, and we have been cited no rule of law that denies them a right of recovery. If, instead of moving to new quarters, they had chosen not to reopen the business, it could hardly be contended that they would not be entitled to recover.

The appellant questions the item of $400 allowed for loss of business during the period intervening between the fire and the collapse of the walls. The appellant would not, of course, be liable to the respondents for any loss they might sustain by reason of the burning of the lodge building and the resulting interruption or diversion of pedestrian travel from the premises. The court based its allowance upon a finding that the dangerous condition of the walls deterred customers from patronizing the restaurant. The books of the respondents show that they not only made no profit during this period, but suffered an actual loss of over $200. The fact that, when the wall did fall, it shattered the restaurant and injured one of its employees, is proof that the reluctance of patrons to enter the restaurant was not groundless.

We have seen that the respondents reopened their restaurant at the new location on Fourth avenue July 14th. The court allowed for loss of profits at the rate of $400 a month for the months of March, April, May and June. The appellant contends that, in view of the fact that respondents did not reopen in the Williams building, no allowance should be made for profits; and that, in any event, no allowance should have been made for the months of May and June, since the Williams building was ready for use the first of May. The respondents, on the other hand, urge that the court should have allowed some eight hundred dollars more.

That the respondents are entitled to some allowance for loss of profits, under the circumstances, cannot be questioned. In the course of their five years in the Williams building, they have established a profitable business. The evidence shows that their gross receipts for the year 1936 were over $25,000, and their net profits around $4,500; their profits for the year 1935 were $2,800; the profits for each of the years 1933 and 1934 were approximately the same as those of 1936. Thus we see that it was possible to make a fairly definite finding of the loss of profits sustained by interruption of their business without resort to speculation.

The respondents could have reopened in their old location about May 1st. The operation of their business was interrupted for two additional months by reason of their decision to remove to the new location. The record is not clear as to the reasons why the change was made, although there is some intimation that the room was not quite ready for re-occupancy at the end of April, when the respondents determined to make the change. While the respondents are entitled to just compensation for the loss sustained by them chargeable to the appellant's negligence, they are not entitled to recover for loss consequent upon their removal to a new location. If they had decided to make the change at the time their restaurant was damaged, it is probable that they would have been able to reopen before May 1st. Under the circumstances, we think the respondents were not entitled to the allowance made for the months of May and June.

The judgment of the trial court is affirmed as to the respondents Williams, Teter and Keir; and the cause is remanded to the superior court with direction

to reduce the judgment in favor of the respondents Herbert and Moody to $4,200.

HOLCOMB, MAIN, BEALS, and SIMPSON, JJ., concur.