[No. 27630.  *En Banc.*  March 23, 1940.]

WALTER J. BLESSING, *Respondent,* v. CAMAS PRAIRIE
RAILROAD COMPANY, *Appellant.*[1]

[1]Reported in 100 P. (2d) 416.

Roy F. Shields, F. L. Stotler, and Hamblen, Gilbert & Brooke, for appellant.

Robertson & Smith, for respondent.

MILLARD, J.—This action was brought to recover for injuries sustained by plaintiff as the result of derailment of a locomotive on which plaintiff was employed at that time as a fireman. The claimed negligence alleged as the proximate cause of the derailment of the train and the consequent injury of plaintiff was the failure of the defendant railway company to provide and maintain a ditch between its track and the hillside.

The cause was submitted to the jury on the question whether the defendant, in the exercise of reasonable care, was required to provide and keep open a ditch along its track at the place of derailment, and whether the defendant provided and maintained such ditch. The jury returned a verdict in favor of the plaintiff. The appeal is from the judgment entered on the verdict following denial of defendant's motion for judgment notwithstanding the verdict.

The only question presented by this appeal is whether the evidence was sufficient to warrant submission of the cause to the jury and the sufficiency of the evidence to sustain the verdict.

Counsel for appellant contend that, during the entire existence of the appellant railroad—approximately thirty years—appellant never experienced any trouble from earth or rocks sliding upon its track at the scene of the accident, therefore it was not negligent in failing to provide some safeguard against that contingency. That is, a person is not bound to ward against a result which cannot be reasonably expected to occur,

and negligence cannot be attributed to him for failing to do so. It is further insisted that the slide which caused the derailment was the result of an unprecedented storm and one which the appellant could not anticipate. Counsel for appellant also urge that, in any event, the construction and maintenance of a ditch such as respondent alleged should have been constructed and maintained, would not have been adequate to stop a slide of the proportions of the one which came upon the appellant's track at the time in question.

If it were appellant's duty to maintain a ditch to prevent drainage, dirt, and rocks from going upon the track, and if there is competent evidence that appellant's breach of that duty was the proximate cause of the derailment, the judgment must be affirmed.

All competent evidence in the record which is favorable to the respondent must be regarded as true, and we must give to the respondent the benefit of every favorable inference which may reasonably be drawn from such evidence.

"Where the minds of reasonable men may differ, the question should be submitted to the jury. If, when so considered, we find there is substantial evidence to sustain the verdict, the judgment must be affirmed." *Gibson v. Spokane United Railways*, 197 Wash. 58, 84 P. (2d) 349.

The facts are summarized as follows:

Appellant operates a line of railroad from Riparia, Washington, to Grangeville, Idaho. About 10:50 p. m., September 4, 1937, at a point about seven miles west of Lewiston, Idaho, the engine on which respondent was riding, and which was hauling a freight train, ran into a slide. As a result, the engine was derailed and partially tipped over on its left side, and respondent was seriously injured by escaping steam.

At the place of derailment, the railroad is constructed

through a cut known as the Snake river canyon, about two hundred and fifty feet long. To the right of the track, or to the north, the wall of the hillside is vertical for fifteen or twenty feet, and the ground slopes back therefrom and upward many hundred feet at an angle of thirty to forty degrees. It is approximately one thousand feet from the foot of the slope to the top of the hill. The sides of the slope are composed of small rocks and earth; that is, the terrain above the tracks is composed of basaltic rock and of loose fragments of rock and soil. In order that the picture may be clear, we again state that, at the point of the accident, the railroad was constructed through a cut in the toe of the slope, the cut being about two hundred and fifty feet in length, fifteen to twenty feet deep on the north side and six to ten feet deep on the south or Snake river side.

In the cut above mentioned, the train suddenly came upon a large slide on the track, the engineer was unable to stop his train, the engine ran into, and upon, the slide, toppled over on its left side against the south, or river bank of the cut. There is some evidence that the slide which caused the derailment covered the track for a distance along the rails of about ninety feet and to the depth of a foot and a half to two feet; that, at the point where this slide came upon the track, during the thirty years' existence of the railroad company, the appellant had never prior thereto had any trouble from rocks or earth coming upon the track, nor had there been water running down upon the track from the hillside at that point. That was the testimony of witnesses—employees—who testified in behalf of the appellant.

Some of the testimony on behalf of appellant was to the effect that the purpose of a railroad company in constructing a ditch alongside its track was primarily

for drainage; that, under ordinary conditions, such a ditch would be three feet wide at the top with a one-to-one slope, making the ditch a foot wide at the bottom; that, while these drainage ditches do serve the purpose of catching small stones, earth, and material that may slough off the side of the cut, they are not constructed for the purpose of stopping slides.

The testimony is in sharp conflict as to the condition of the drainage ditch at the scene of the accident before the slide occurred. The conflict in the testimony respecting the yardage of material in the slide is just as sharp.

Some of appellant's witnesses testified that, prior to the accident, there was a well-defined drainage ditch which had been kept open; that, at the scene of the derailment, there was a ditch about three feet wide, possibly a foot deep below the ties through the cut in question. One of appellant's witnesses testified that, while the original ditch through the cut had been partially filled, nevertheless, at the time of the derailment, the ditch was probably a foot below the top of the ties and two or three feet wide, varying somewhat in places. An assistant supervisor of maintenance of appellant company, who visited the scene of the accident the night it occurred, testified that the slide was approximately ninety feet long and would average from twelve to eighteen inches in depth and that it filled the cut from slope to slope; that the slide was composed of mud, sand, gravel, and small rocks, the largest being about one foot in diameter, and that there was evidence of water having run through the cut. He estimated the quantity of material in the slide at one hundred and ten yards. A supervisor of maintenance of appellant testified to the same effect. The rear brakeman on the derailed train estimated the slide was fifty or fifty-five feet along the track.

The general manager of appellant visited the scene of the accident the following morning before the wreckage or slide material had been removed. He testified that, on the right-hand rail, the north rail next to the embankment, the slide material was from two and one-half feet to fifteen or eighteen inches deep on the opposite rail; that, between the rails, the ground was covered with the material, the length of which was about ninety feet. He further testified—his testimony is disputed by other officials and employees of appellant —that no ditch had ever been dug at the particular point where the derailment occurred; that the railway company had dug ditches at various places on the way for the seventy-two miles from Lewiston to Riparia; that those ditches were about four feet wide and two feet below the ties. He further testified that the purpose of those ditches was two-fold—for drainage and to serve as a catch basin for any falling rocks from the hillside. He answered in the affirmative the question: "Any falling rocks mixed with earth that might come down from the hillside?"

Respecting necessity for and construction of a ditch at the scene of the derailment, appellant's general manager testified that there was no waterway at that particular place and no previous trouble due to falling rocks or slides; and, ordinarily, the railroad company did not construct a ditch at that point of that character. His further testimony we quote as follows:

"Q. You didn't wait until you had some trouble with falling rocks with reference to the derailment of trains and injuries on a particular stretch of track before constructing a ditch, did you? A. Yes. We were guided by the appearances, Mr. Robertson. There was no waterway there and a ditch wasn't necessary for drainage and we didn't consider it a hazardous place. Q. In other words, what do you mean—there was no waterway for drainage? A. There was no waterway from

the hillside. The character of that country—it is made up of numerous draws all along the railroad, but there is no draw at this particular point."

A farmer, residing a mile from the scene of the accident, testified on behalf of appellant that, the next morning, when he visited the wreck, the track had not been cleared, and that the slide material on the track was about eighteen inches in depth and from seventy-five to eighty feet along the track.

An assistant county engineer of Whitman county, called as a witness by respondent, testified with respect to the conditions he found at the scene of the derailment; that the railway cut was made through material deposited at that point through drainage coming down from the draw in the form of a delta, and this deposited material consisted of dirt, coarse sand and loose rock. It was his opinion the slide was the slough of the cut which existed immediately adjacent to the railroad track as a result of a certain amount of drainage water coming down through and soaking that material and moistening it, which permitted it to flow out onto the railroad track. His description of the draw was that it was about five feet in width where it entered the railroad cut and that it gradually widened as it went up the hill until, at a point about three hundred or four hundred feet up the hill, it was probably thirty feet in width, and from that point up to the head its width increases to five hundred feet.

He testified that the digging of a ditch between the hillside and the railroad track, keeping the ditch cleaned out at all times, would greatly help as long as too much material did not come down the draw, and that it would be regular maintenance to clean out the ditch from time to time in order to prevent the material from getting onto the railroad track. He was of the opinion, from his examination of the material which

came down immediately adjacent to the cut, that there would have been no possibility of that amount of material coming on the track if a proper ditch had been maintained, because the point of sloughing is seventeen feet from the track, and a ditch two feet deep would have more than handled the slide of approximately ten yards. The washed area, this witness estimated, was about one-half acre and was probably washed clean years ago when the delta was built, that there was no indication that the washing occurred within recent years. The deposited material came out of the mouth of the draw because of water flowing down through the draw and loosening it. He found no evidence of material sliding down the sides of the draw above the material which had been deposited there.

Appellant's supervisor of maintenance testified that the draw or gully extended up to drainage area of twelve acres and had been the natural drainage of all the water that fell in the entire twelve acres for many years. He further testified that it was necessary from time to time to clean out the ditch along the side of the track, otherwise dirt and rocks would go on the track.

In support of the position of appellant that the slide was caused by an unprecedented rain, witnesses testified an intensive rain washed earth and small rock off the slope down to bedrock and caused the slide; that the floor of a bridge (this bridge was half way up the length of the wrecked train) spanning a gully twelve feet wide which leads to a canyon back into the hills was covered with water. This witness had never during the past thirty years seen any water in that canyon. Another item of evidence is that, a quarter of a mile west of the scene of the slide, another canyon comes down from the hills and appellant has a small bridge at that point, at which place the county

maintains a culvert under the road. This culvert, the same night of the accident, was "washed out."

Some of appellant's employees testified that, from time to time, they could expect a heavy rainfall at the scene of the accident; "We have heavy rains from time to time in that section;" and that "it might have rained the day before. Sometimes we have two or three wet days in September. We could anticipate rain . . . ;" that there was a light rain when the train left Lewiston about ten thirty the night of the accident, and "about a mile east of Wilma, it was raining pretty heavy. Where we stopped there was just a light rain." A brakeman on the derailed train testified, concerning the gully mentioned above, that "it was a well defined cut. You could see it as you passed on the train." He estimated that the material on the track was forty to fifty feet in length and that the pilot or cow-catcher of the locomotive was about four inches above the rails of the track.

■ This action is within the provisions of the Federal employers' liability act (45 U. S. C. A., § 51). Under that statute, a railroad company is liable for injury to its employees by reason of any defect or insufficiency due to its negligence in its track, roadbed, or other equipment. The nondelegable duty of appellant was to provide the respondent with a safe place in which to work and the continuing duty imposed upon appellant was that of exercising reasonable care in keeping that place safe.

In *South v. Seattle, Port Angeles & W. R. Co.*, 99 Wash. 51, 168 Pac. 896, we affirmed a judgment in favor of a locomotive fireman against a railroad company for personal injuries sustained by the plaintiff as the result of the collapse of a railroad trestle under the weight of a locomotive upon which the plaintiff was employed as a fireman. We said, in the course of

that opinion, respecting the nondelegable duty of the railroad company to provide its employees with a safe place in which to work, and by proper and reasonable inspections from time to time discover defects and remedy same, that:

"The positive, nondelegable duty of the master to exercise ordinary care and diligence to furnish his servants a reasonably safe place in which to work and, by proper and reasonable inspections from time to time and by the use of ordinary care in making repairs, to keep the place in a reasonably safe condition, is well understood and needs no elaboration. It is likewise well settled that this degree of care is commensurate with the dangers to which the servant is exposed. It is equally elementary that what is reasonable care in a given case is always a question for the jury whenever, upon the evidence adduced, reasonable minds might fairly reach different conclusions, and that, upon motion for nonsuit or for an instructed verdict, the plaintiff is entitled to have weighed in his favor every reasonable inference to be deduced from the evidence. . . .

"The drift of the trial was such that, under the evidence, the question in the case is whether the defendant exercised reasonable care and prudence in inspecting the trestle and in keeping it in a reasonably safe state of repair for the purpose for which it was being used. This duty is nowhere better defined than by Labatt in his work on the law of Master and Servant:

" 'The character of the inspection which the master is bound to make is described by various epithets and phrases, all of which, as will be seen from the subjoined note, are essentially the logical equivalent of the proposition that the examination must be such as a person of ordinary prudence would have made under the circumstances. The question whether the examination to which the instrumentality which caused the injury was actually subjected before the accident was such as to satisfy the standard thus indicated is primarily one for the jury. This principle is not affected by the fact that the preponderance of the testimony,

whether measured by the number of the witnesses or the comparative credit which the court may think to be due to each, is in favor of one litigant.' "

In *King v. Griffiths-Sprague etc. Co.*, 45 Wash. 425, 88 Pac. 759, we held that if, in the performance of his duty to furnish the employee a safe place in which to work, the master ought to have known of the danger, the master is guilty of negligence; for the servant has a right to rely on the master's duty to furnish a safe place, and to assume that he had made all the necessary observations and investigations to that end. See, also, *Mattson v. Eureka Cedar Lumber etc. Co.*, 79 Wash. 266, 140 Pac. 377.

There was ample evidence on the question of negligence of appellant in maintenance of the ditch as the proximate cause of the injury to respondent to warrant its submission to the jury. Whether the maintenance of a ditch would have prevented the derailment, was a question for the jury.

Appellant was chargeable with knowledge of the existence of conditions which permitted the slide to occur. Appellant knew that the natural drainage was toward the track and would carry dirt and rocks upon the track if a ditch were not provided. The condition was such as to necessitate a ditch between the hillside and the track. Such a ditch had in other years been provided, and in the maintenance of same it was cleaned in 1930. There was competent evidence of a condition which would permit rocks and dirt from the hillside to land on the track if a proper ditch were not maintained between the hillside and the track. There was also competent evidence that the ditch dug between the track and the hillside at the time of the construction of the railroad was competely filled, prior to the slide, from one end of the cut to the other end with rocks and dirt.

Whether the slide was of such proportions that an ordinary ditch would have prevented it from covering the track, was, we repeat, a question of fact for the jury. The testimony is conflicting as to the amount of material in the slide on the track. The estimates vary from ten cubic yards to one hundred and ten cubic yards. Whether the slide covered the track to a depth of more than eighteen inches for a distance of ninety feet, or whether the dirt, mud, and rocks covered the track a lesser depth and a distance not exceeding fifty feet, was a question of fact for the determination of the jury.

A ditch four feet wide, two feet deep, and fifty feet long would contain approximately fifteen cubic yards of material. A ditch the same depth and width ninety feet long would hold in excess of twenty-six cubic yards. If the slide covered the track, which we will assume was a standard gauge railroad track, to a depth of eighteen inches for a distance of ninety feet, the amount of material would not be in excess of twenty-four cubic yards. If the distance were fifty feet there were not more than thirteen cubic yards of material on the track. If the depth were less, of course the yardage would be correspondingly smaller.

Under the authorities, the failure to maintain the ditch constituted negligence, which, under the evidence, was the proximate cause of the derailment of the freight train.

We note appellant's criticism of the testimony of respondent's witness—a young civil engineer—to the effect that that witness did not visit the scene of the accident until a year subsequent to its occurrence, which witness gave as his opinion, from the conditions he observed there, that the amount of material which came down from the slope did not exceed ten yards. Our attention is also directed towards photo-

graphs, introduced in evidence by respondent, which were taken some time after a large crew of workmen had been busy in the removal of material from the track.

The criticism is answered by the jury's verdict. The weight of the evidence was for the jury. The question of the credibility of the witnesses was for the jury. No question is raised respecting the admissibility of the evidence. The fact that the opinion of the witness was based on what he observed a long time subsequent to the derailment, went to the weight of the evidence and was, of course, for the jury.

In *Gooschin v. Ladd*, 177 Wash. 625, 33 P. (2d) 653, we approved the admission in evidence of photographs which were taken after the accident and subsequent to the time of the widening of the shoulder of the highway. The photographs disclosed a decidedly different condition where the accident occurred than that at the time of the accident. A vital question in that case was whether the shoulder, at the time of the accident, was wide enough to permit the respondent's automobile to be parked on the shoulder with all four wheels of the automobile off of the paved portion of the highway. We also approved the action of the trial court in permitting a witness to testify that he examined the automobile twenty hours after the accident and discovered that the windshield was generally muddy except where the swipe was located. Another witness was permitted to testify that, five or six days after the accident, he found a crack in the hose which feeds the swipe which prevented operation of the windshield swipe. It was argued in the dissenting opinion that the testimony was inadmissible; that the fact that there was such a break in the mechanism of the automobile after the collision, was not competent evidence of the existence of such break prior to the collision.

■ Counsel for appellant argue that an unprecedented rainfall, which was not a condition it was the duty of appellant to anticipate, caused the slide.

Whether there was a rain storm of unusual proportions on the night of the accident, was a question of fact resolved by the jury against appellant. The contention of unprecedented rainfall which would constitute the cause of the derailment as an act of God was rejected by the jury. Appellant may not successfully invoke the rule followed in *Topping v. Great Northern R. Co.,* 81 Wash. 166, 142 Pac. 425, L. R. A. 1915F, 1174. In that case, the storm was an unprecedented one both in length of duration and in its violence.

If there was an excessive rainfall, that was to be expected. That locality, appellant concedes, had been visited from time to time by heavy rains, snow had covered the hills and chinooks had melted it suddenly, but argues that never before in its thirty years' existence had it experienced a slide at the scene of the derailment, nor had water run down the draw or gully so as to present any drainage problem or necessitate the construction of a culvert.

The most that can be said is that a heavy rain somewhere in the vicinity of the scene of the derailment concurred with the negligence of the appellant in causing the derailment. That being so, the rainfall was not the sole cause of the accident; and if it be deemed an act of God, appellant is, nevertheless, liable for the injury of which respondent complains, as a concurring cause of the accident was appellant's negligence in failing to maintain a ditch.

In *Teter v. Olympia Lodge No. 1, I. O. O. F.,* 195 Wash. 185, 80 P. (2d) 547, we held a landowner was liable for damages from the fall of the walls left standing after a fire had destroyed the inner portion of a

building and refused to hold the fall was excusable as due to an act of God, where a strong wind concurred with the negligence of the landowner in producing the result. We said:

"While it is likely the walls would not have fallen on the night of the 16th if it were not for the occurrence of a strong gale, yet we do not conceive that this fact absolves the appellant from responsibility. The occurrence of strong winds in the winter months was reasonably to be expected. We are not persuaded that the wind on the night of February 16th, strong as it was, was so unprecedented as to fall within the definition of an act of God and the sole cause of the collapse. The most that can be said is that the strong wind concurred with the negligence of the appellant in producing the result.

" 'In order that this rule may apply the act of God must be the sole cause of injury, for if an act of God and the negligence of an individual are concurring causes of an injury, the individual who was guilty of negligence is liable for the injury. One who is under a duty to protect others against injury cannot escape liability for injury to the person or property of such others on the ground that it was caused by an act of God unless the natural phenomenon which caused the injury was so far outside the range of human experience that ordinary care did not require that it should be anticipated or provided against, and it is not sufficient that such phenomena are unusual or of rare occurrence. The fact that one was negligent in failing to take proper precautions against ordinary occurrences will not charge him with liability for an injury caused by an act of God, which would have caused the injury even had proper precautions been taken, but the fact that an injury was actually caused by a natural phenomenon of such unusual nature that it might be termed an "act of God" will not excuse from liability where precautions which should have been taken to guard against occurrences which should have been expected were negligently omitted and such precautions would have prevented the injury.' 45 C. J. 736, § 127."

Another apt authority, indistinguishable on principle, from the case at bar is *Tope v. King County,* 189 Wash. 463, 65 P. (2d) 1283. In that case, we held that, where the culpable negligent act of the county in casting surface and outlaw waters on the lands of others combined with the act of God—an unprecedented flood—to the damage of lands which would not have been reached but for the county's ditch and culvert diverting the waters, the county is liable for such loss as is caused by its own act concurring with the act of God, provided the loss would not have been sustained but for the county's negligence; and *the burden of proof is* upon the county *to show that the loss is due solely to the act of God.* See, also, *O'Connor v. Chicago, M. & St. P. R. Co.,* 163 Wis. 653, 158 N. W. 343.

A review of all the authorities cited would serve no useful purpose. They are either not out of harmony with what we have said above, or on dissimilar situations call for the application of rules different than those applicable to the facts in the case at bar.

The judgment is affirmed.

BLAKE, C. J., MAIN, BEALS, and GERAGHTY, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to agree that appellant was in any way negligent.

The only negligence charged either in the complaint or by the evidence is that appellant did not maintain a ditch along the side of its roadbed in order to stop soil from sliding or rocks from rolling upon its track. It must be borne in mind that appellant's railway line runs through an arid country along the banks of the Snake river. But little moisture comes to this area, though there are occasional heavy rainfalls in the summertime and some snow during the winter months. Above the track are high hills covered with sand and rock, a small amount of vegetation, a

little grass in places, and a small amount of grease wood or mesquite. Although land and rocks covered the mountain side of the track, no stones, earth, or water had come onto the track at the place where the accident occurred during the thirty years of the road's existence.

The undisputed testimony of appellant's supervisor of maintenance, of its general manager, a retired engineer who had run on the line for twenty-five years, one brakeman of many years experience, another brakeman who had run on the line for thirty years, a section foreman on the particular location from 1930 to the time of the accident, and other section men, testified that never before had there ever been any slide nor any trouble occasioned by rocks or earth coming on the track of the railroad at that point, and that they had no trouble from water coming from the hillside above the track.

The evidence of the railroad workers showed that they patrolled the railway about three times a week during the summer and nearly every day during the winter, that, during the rain storms and chinooks, no water ran by the roadbed where the accident occurred.

"A man is not bound to ward against a result which cannot be reasonably expected to occur, and negligence cannot be attributed to him for failing to do so." *Atkinson v. Goodrich Transp. Co.*, 60 Wis. 141, 18 N. W. 764, 50 Am. Rep. 352.

A railroad company, in order to be free from negligence, need not anticipate slides along its roadbed in places where an experience of many years has taught its officers and workers that no danger existed.

"That which never happened before, and which in its character is such as not to naturally occur to prudent men, to guard against its happening at all, cannot, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its

possible happening and guarding against that remote contingency." *Hubbell v. Yonkers,* 104 N. Y. 434, 10 N. E. 858, 58 Am. Rep. 522.

This rule has been approved in *Hysell v. Swift & Co.,* 78 Mo. App. 39; *Woolen Mills v. Edwards,* 84 Mo. App. 448; and *Morris v. Southern Pac. Co.,* 168 Cal. 485, 143 Pac. 708.

Our own cases determine the question for consideration here.

The case of *Topping v. Great Northern R. Co.,* 81 Wash. 166, 142 Pac. 425, L. R. A. 1915F, 1174, presents a factual situation somewhat similar to that present in the instant case. The individual killed in the accident which occasioned the action in that case, was a passenger to whom the railway company owed a greater degree of care than appellant here owed to its employee.

The facts in the *Topping* case disclose that a snow slide swept the passenger train of the railway company from the tracks down the mountain side, causing Topping's death. The fact was stressed that the slide occurred at a point where none had been known before over a period of seventeen years, although it was shown that slides had occurred in the general vicinity. The importance which the court ascribed to this fact is disclosed in the following portions of the opinion:

"While it was known that this track was for the purpose of holding trains when taken off the main line, it is not shown, nor is it a fact, that any other slide had occurred at this particular point. In fact, the undisputed evidence is that no slide had ever occurred at this point previously. The road had been operated and maintained for a period of seventeen years at this place, and no slide had ever occurred at this place. There was no negligence, therefore, in failing to anticipate a slide or an unusual storm or an unusual occurrence.

". . . No one at that time anticipated, nor at any other time could anticipate, that a snowslide was about to occur at that place. It certainly cannot be held that

the officers in charge of the train were required to know in advance that the storm which was then raging would continue for an unprecedented length of time, or that an avalanche of snow would come down the mountainside at that place where a slide never had occurred when the snow had been much deeper. They certainly, in the exercise of their judgment and experience, were authorized to place the train where past experience had shown it would be safest and most convenient. . . .

" . . . While the snow was deep, it was no deeper than it had been on previous occasions, when no slide had occurred at this place.

" . . . And it was not shown that these officers, or any other person in that vicinity or elsewhere, then knew that a slide would occur or suspected that this place was not as safe as any other place in that vicinity. The belief was that this was the safest place, and this belief was justified by past experience and under all the then existing conditions. . . . that they had operated this road for a period of seventeen years without an avalanche or snow slide at this particular place; that this was an exceptionally severe storm; that it lasted for an exceptionally long time; and that, before that time, no accident of this kind had ever occurred upon its line in this state. It is too plain for argument that no negligence of the appellant was shown, but that the slide, which was the proximate cause of the accident, was a cause over which the railway company had no control, which it did not and could not foresee or know of until after it occurred, and for which it is not responsible."

This court, upon the basis of the foregoing statements relative to the fact that the company was to be guided by past experience, held that there was no negligence on the part of the company.

The majority opinion, in referring to this case, says:

"In that case the storm was an unprecedented one both in length of duration and in its violence."

To my mind, the slide which covered appellant's roadbed was as unexpected and unprecedented as the

slide which occurred in the Cascade mountains and destroyed the train of the Great Northern Railway Company.

*Boskovich v. King County,* 188 Wash. 63, 61 P. (2d) 1299, 107 A. L. R. 591, is a case strikingly like the one before us in most of the circumstances. The facts disclose that plaintiff was injured from a slide which came from a mountain side onto the highway upon which she was driving. The evidence showed that slides had occurred in the vicinity of the accident, and that the formation of the hills adjacent to the road was of a character such as would naturally result in slides during the period of heavy rainfalls. After citing the *Topping* case, *supra,* as sustaining authority, we stated:

"Respondent argues that the county should have constructed some sort of a bulkhead or retaining wall which would have prevented the slide, but a careful reading of the evidence convinces us that no reasonable or practicable construction at the point of the slide would have prevented it, and also that the county had no notice that there was danger of a slide at that particular point."

The court, in *Foley v. New York, O. & W. R. Co.,* 97 N. J. L. 278, 116 Atl. 781, had for consideration a case brought under the provisions of the Federal employers' liability act. In that case, a brakeman was killed as the result of the derailment of a train upon which he was riding caused by striking a boulder which had rolled upon the track. The court stated:

"The plaintiff's case, as we view it, is lacking in any proof that from the conditions as they existed at the place of the accident an ordinarily prudent person could have anticipated the happening of this accident. The trial court should have granted the motion for a nonsuit on the failure of proof of negligence. The evidence offered by the defendant confirms and strengthens this opinion. It was proved that this track was laid in 1895. To the time of the accident it had been in con-

tinual use for twenty-five years. During this period no stones had ever been known to roll down from the hill in the vicinity of the place where the accident occurred or where the topography of the land was similar to the land at the place of the accident. There was no evidence that by human agency stones had been rolled from the hillside to the track. The photographs offered in evidence show that the hill was not abrupt and did not overhang the track. There seems to be nothing at the location where the accident occurred which would cause an ordinarily prudent person to take the precautions the plaintiff urges should have been taken to protect the track from obstructions coming from the hillside. · Liability does not flow from every accident. Accidents may occur grievous in their consequences for which no one is legally or morally responsible."

The facts disclosed in *Le Deau v. Northern Pac. R. Co.*, 19 Idaho 711, 115 Pac. 502, Ann. Cas. 1912C, 438, 34 L. R. A. (N. S.) 725, show that a rock rolled down a mountain side, crashed through a window of a car in which plaintiff was riding, and injured him. In holding that the railway company was not responsible, the court said:

"It is clear, therefore, that the accident did not occur by reason of anything which the appellant or its agents or employees did, nor did it occur through any defect in the appliances which appellant was using, or the instrumentalities it was employing as a common carrier. The only theory on which appellant could be held for the results of this accident would be that it owed to respondent, and to all of its passengers, an active duty to employ such means as were necessary and sufficient to either clear the mountainside of loose or overhanging rock and stone, or else to construct along its right of way such retaining walls or barriers as would be likely to prevent rock and stone from rolling down the mountainside onto its track. To require such an active duty on the part of a railroad company operating in this intermountain region, where roads are necessarily built through canyons and around mountainsides,

where the bluffs and hills rise precipitously for hundreds and sometimes thousands of feet above, would be imposing upon the company a duty that would be burdensome and might sometimes prove prohibitive to transportation companies. The mere suggestion of building retaining walls along railroad rights of way through some of the canyons and ravines in this mountainous country demonstrates its futility."

Of like import are *Kennett v. Federici*, 200 Wash. 156, 93 P. (2d) 333, and *Garner v. Pacific Coast Coal Co., ante* p. 143, 100 P. (2d) 32.

The cases of *Teter v. Olympia Lodge No. 1, I. O. O. F.*, 195 Wash. 185, 80 P. (2d) 547; *Tope v. King County*, 189 Wash 463, 65 P. (2d) 1283; and *O'Connor v. Chicago, M. & St. P. R. Co.*, 163 Wis. 653, 158 N. W. 343, cited by the majority, have no application to the facts presented in the case at bar. In those cases, the defendant claimed that the damage was occasioned by an act of God. Appellant here does not contend that the slide was occasioned by an act of God. It defends upon the ground that it was not negligent in that it could not anticipate an unexpected event.

The actions of reasonable men exercising due care are guided in most ways by the light of experience. What has happened to them or others are guides for present conduct.

The appellant in this case built its railway in a proper manner and through many years properly patrolled it to guard against accidents. No notice came to appellant during a period of thirty years that there was any danger of slides or falling rock at the place where the accident occurred. They had no notice that such an accident would occur, and were not compelled to anticipate the unexpected. It was not necessary that the appellant, in the exercise of due care, maintain a ditch at the side of its roadbed.

Under the authorities cited, and I find none to the

288

contrary, it was the duty of the trial court to hold the company blameless and grant its motion for a directed verdict or for a judgment notwithstanding the verdict.

For the reasons given, I dissent.

STEINERT, ROBINSON, and JEFFERS, JJ., concur with SIMPSON, J.